ALARCON, Circuit Judge:
 

 Roland Ogbogu Oba (“Oba”) appeals from the judgment entered upon his conviction for importing a controlled substance into the United States in violation of 21 U.S.C. § 952. Oba contends that the district court erred in denying his motion to suppress the heroin and oral statements obtained from him by United States Cus
 
 *1125
 
 toms officers following a border stop. Oba seeks reversal of the judgment on three discrete grounds:
 

 1) The United States Customs officers’ prolonged detention of Oba was not justified by facts showing that a reasonable suspicion existed that he had placed a controlled substance in his alimentary canal.
 

 2) The Government failed to meet its burden of proving that Oba’s oral consent to an x-ray examination was obtained freely and voluntarily.
 

 3) Oba’s written consent to an x-ray examination and oral statements were inadmissible because they resulted from a renewed interrogation that followed his express request for the advice of counsel.
 

 We affirm because we conclude that the officers had reasonable suspicion to detain Oba for importing a controlled substance. We also hold that Oba’s consent to an x-ray was voluntary and that he did not invoke his right to an attorney to advise him during police interrogation concerning the importation of a controlled substance into the United States.
 

 I
 

 PERTINENT FACTS
 

 At the suppression hearing the Government introduced the declarations of Inspector Edward August Schack and Special Agent James Dinkins of the United States Customs Service. Oba testified as the only defense witness. His testimony was in conflict with the Customs officers’ allegations on each material fact. The district court found that the officers were credible witnesses and accepted their version of the facts. We review a district court’s credibility determinations and findings of historical fact for clear error.
 
 United States v. Caicedo-Guarnigo,
 
 723 F.2d 1420, 1424 (9th Cir.1984) (credibility determinations reviewed for clear error);
 
 United States v. McConney,
 
 728 F.2d 1195, 1200 (9th Cir. 1984),
 
 cert. denied,
 
 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984) (historical fact reviewed under clearly erroneous standard). The district court’s findings in this case were not clearly erroneous. Accordingly, we accept the following version of the facts.
 

 Oba arrived at San Francisco’s International Airport on June 1, 1990, at approximately 12:45 p.m. on Lufthansa Flight Number 454 from Lagos, Nigeria via Frankfort, Germany. Nigeria is a source country for narcotics. On that date Inspector Edward August Schack of the United States Customs Service was employed as a roving enforcement inspector in the baggage section of the San Francisco International Airport. His duties were to meet international passengers as they came off airplanes to determine whether they should be referred to a secondary, inspector.
 

 Inspector Schack contacted Oba during a routine border entry processing of arriving passengers. Oba’s entry form indicated that Sacramento was his destination. Inspector Schack asked Oba to explain his travel plans. Oba stated he was going to Sacramento. Oba told Inspector Schack he had no knowledge of Sacramento. He represented that he was going to live with his girlfriend. When first asked if she was going to pick him up, he was vague about how he would travel to Sacramento. He then stated he was going to travel there by bus or by plane. Oba initially told Inspector Schack that he had traveled to. his birthplace in Nigeria only once since he moved to the United States in the early 1980’s. Inspector Schack then noted that Oba’s passport showed that he had made additional trips to Nigeria. When Inspector Schack asked Oba again if this was his only trip to Nigeria, Oba replied that he had been to Nigeria twice since 1982. The inconsistency between the passport entries and Oba’s responses caused Inspector Schack to suspect that Oba was concealing something.
 

 Oba stated that he was presently unemployed but had worked part-time. Because Oba was unemployed, Inspector Schack formed the belief that Oba’s trips to Nigeria were unusual because the cost of one trip was between $1,500.00 to $1,800.00. Inspector Schack concluded that Oba’s answers had been evasive concerning his trips to Nigeria, his destination, and that he fit
 
 *1126
 
 the profile of a drug smuggler. Inspector Schack directed Oba to go to a “search room” for a secondary examination.
 

 During the secondary examination, Inspector Schack discovered that Oba had two Nigerian passports. The passports disclosed that Oba had made three trips to Nigeria since October 1989. When asked to explain the reasons for these trips, Oba replied that he made a trip in December to attend his mother’s funeral. He told Inspector Schack that the October 10, 1989 trip was to celebrate Christmas. This explanation made no sense to Inspector Schack.
 

 Inspector Schack received a report from the Treasury Enforcement Communications System archives that revealed that a person named Rolland Oba with the same birth date as the appellant had entered the United States on January 23, 1990. Neither of the passports showed an arrival stamp for that date.
 

 Inspector Schack also interviewed Fyne-face Amechi, a Nigerian national, who had been on the same flight from Nigeria. Amechi was carrying Imodium, an antidiar-rhea medication, and Auomine, a medicine used to treat motion sickness. Amechi denied knowing Oba. Oba also denied knowing Amechi. Amechi’s personal address book contained Oba’s name, address and telephone number. When confronted with Amechi’s address book, Oba stated he met Amechi on the trip to the United States.
 

 Inspector Schack visited the interview room a number of times prior to 4:30 p.m. to inquire how Oba was feeling. Oba replied that he felt fine except for being constipated. Oba did not complain of being ill, ask for medical attention, or exhibit signs of ill health.
 

 Special Agent Dinkins was contacted by Inspector Schack at approximately 2:15 p.m. on June 1, 1990, to come to the search room to interrogate Oba. Special Agent Dinkins was accompanied by Special Agent Wallrapp. Special Agent Dinkins asked Oba to explain the fact that Immigration records showed that a person with his name and birthdate entered the United States on January 23, 1990. Oba replied that someone must have stolen his green card and passport.
 

 Oba told the officers that he was receiving an unemployment check of $184 a week, and between $300.00 and $500.00 a month from the Manpower Employment Agency. Oba stated that he paid for some of the trips and his parents also sent him money.
 

 At approximately 3:00 p.m. Special Agent Dinkins asked Oba if he would consent to an x-ray examination to determine whether he had ingested narcotics. Oba replied that he would consent to an x-ray but he would not sign an x-ray consent form because he wanted to take legal action against the United States Customs Service when the x-ray showed that he had not ingested any narcotics. Oba stated that he wanted an attorney to look at the consent form before he signed it.
 

 Special Agent Dinkins informed Oba that Customs regulations required a written consent. Oba was told that he did not have to sign a consent form. Instead, Oba was advised he would be detained for a bowel movement. Thus, despite his oral consent, Oba was not taken to the airport medical facility for x-rays at that time.
 

 Inspector Dinkins testified during cross-examination that Customs regulations also require that if a person is monitored for a bowel movement, he shall be taken to a medical facility as soon as possible and placed under medical supervision to minimize injury in the event that a concealed drug container should rupture. Special Agent Dinkins also testified that there was a medical facility equipped with an x-ray machine at the airport within 100 yards of the search room. A doctor is stationed at the facility. That facility closed at 10:00 p.m.
 

 At approximately 10:00 p.m. Special Agent Dinkins told Oba that he was going to be transported to a hospital for medical observation of a bowel movement. In response Oba stated he would sign a consent form. Oba did so at 10:05 p.m.
 

 
 *1127
 
 Oba was x-rayed at the San Mateo County Hospital. The x-ray revealed that he had foreign objects in his abdominal tract.
 

 Oba was placed under arrest at 11:20 p.m. for smuggling and importing narcotics into the United States. At 11:47 p.m., Oba had a bowel movement. He passed 28 balloons containing heroin. Over the next 16 hours Oba passed a total of 70 balloons with a gross weight of 1.5 lbs.
 

 At 11:32 p.m., Special Agent Dinkins advised Oba of his constitutional rights. Oba was handed a statement-of-rights form. Oba read it aloud and then signed it. Oba then admitted that he had smuggled narcotics as a carrier for Amechi.
 

 The next day Oba asked the officers when he would be allowed to speak to a lawyer. Oba gave a written statement. This statement was not offered into evidence by the Government. At trial it was introduced into evidence by the defense in an attempt to prove duress.
 

 Oba testified in support of his motion to suppress as follows. He did not tell any United States Customs Officer that he was going to Sacramento to live with his girlfriend. He told the officers that he lived with his girlfriend in Little Rock, Arkansas.
 

 He denied telling the officers he had gone to Nigeria only once or twice in 1982. He informed the officers that he went to Nigeria in October for his grandmother’s funeral. The purpose of his first trip to Nigeria in December 1989, was to assist his brother in obtaining a visa from the American Embassy.
 

 He did not tell the officers that he went to Nigeria in October to celebrate Christina-. He did not tell any officer that someone -Ise must have used his passport to enter the United States on January 23, 1989.
 

 He told the officers that he paid for the trips to Nigeria from his savings and the retirement benefits he received when he left his full-time employment.
 

 When asked to sign an x-ray consent form he refused. He told the officers: “I’m not going to sign until I can see an attorney, a lawyer, because I didn’t want to waive my rights.” Oba further testified that the officers told him he was not going anywhere until he signed the consent form. Special Agent Dinkins also asked him to sign an x-ray consent form. He told Special Agent Dinkins, “I’m not going to waive my rights, that I need an attorney.” Special Agent Dinkins told him that he was not going anywhere until he signed the form.
 

 Oba stated he became feverish and sick at about 5:00 p.m. He informed Special Agent Dinkins of his condition. He asked Special Agent Dinkins to take him to a hospital. Special Agent Dinkins refused.
 

 He signed the consent form after 10:30 p.m. because his fever was getting “real bad.” He signed the form because he believed it was the only way he could get medical attention.
 

 The Government filed a declaration signed by Special Agent Dinkins which contradicted Oba’s declaration filed in support of his motion to suppress. Dinkins alleged that Oba’s declaration contained several “misstatements.” as follows:
 

 Oba did not tell Special Agent Dinkins that he had received $3,200.00 in retirement benefits and $1,500.00 in profit sharing. Oba stated that he went to Nigeria for his mother’s funeral. He also told Special Agent Dinkins that he went to Nigeria in October for Christmas.
 

 Oba did not appear to be ill and did not ask for medical attention. Oba was not told the only way he would get medical treatment was to sign an x-ray consent form. Oba was admitted to the hospital on June 4, 1990 so that he could be observed for any complications arising from the ingestion of heroin. While he was in the hospital, it was established that he might have malaria.
 

 In its memorandum opinion, the district court stated “[ajfter reviewing the evidence submitted, and the testimony of Oba and the agents, the Court finds the agents to be more credible witnesses and accepts their version of the story.” Based upon these facts, the court found that the Customs officers had a reasonable suspicion that Oba was importing narcotics into the
 
 *1128
 
 United States when they detained him, and that his consent to the x-rays was voluntary under
 
 Connecticut v. Barrett,
 
 479 U.S. 523, 529, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987).
 

 II
 

 DISCUSSION
 

 A.
 
 Reasonable Suspicion
 

 Oba contends that he was detained until he had a bowel movement without reasonable suspicion that he was importing narcotics into the United States. We review
 
 de novo
 
 the question whether the record shows that a border detention was based on reasonable suspicion.
 
 United States v. Handy,
 
 788 F.2d 1419, 1420 (9th Cir.1986). The detention of a traveler who enters the United States must be based on a reasonable suspicion that he or she is engaged in smuggling.
 
 United States v. Montoya de Hernandez,
 
 473 U.S. 531, 541, 105 S.Ct. 3304, 3310, 87 L.Ed.2d 381 (1985). To justify a detention for a bowel movement, customs officers must have a “ ‘particularized and objective basis for suspecting the particular person’ of alimentary canal smuggling.”
 
 Id.
 
 at 541-42, 105 S.Ct. at 3310-11 (quoting
 
 United States v. Cortez,
 
 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981)).
 

 Oba argues that the Government has failed to demonstrate that the detention was based on “reasonable suspicion” because the facts known to the Customs officers in this matter are “significantly distinguishable from
 
 Montoya.”
 
 Oba’s reliance on
 
 Montoya
 
 is misplaced.
 
 Montoya
 
 instructs that in determining whether a detention was reasonable a reviewing court must consider “all
 
 the facts surrounding the traveler and her trip." Id.
 
 473 U.S. at 541, 105 S.Ct. at 3310 (emphasis added). In determining whether a detention is valid, our duty is to look at the totality of the circumstances of each case.
 
 United States v. Sokolow,
 
 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). In
 
 Sokolow
 
 the Court rejected the notion that reasonable suspicion can be “readily, or even usefully, reduced to a neat set of legal rules.’ ”
 
 Id.
 
 at 7, 109 S.Ct. at 1585 (quoting
 
 Illinois v. Gates,
 
 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983)). The fact that the facts known to the customs officers who detained Oba differ from those present in
 
 Montoya
 
 does not require this court to hold that reasonable cause has not been demonstrated. Our duty is to consider all the facts surrounding Oba’s conduct and his explanation regarding his trips to Nigeria.
 

 The customs officers detained Oba based on the following circumstances:
 

 1. Oba’s flight to the United States originated in a narcotics source country.
 

 2. Oba gave inconsistent answers to questions about the number of trips he had made to Nigeria.
 

 3. Oba gave an inconsistent explanation about the purpose of his trips to Nigeria.
 

 4. Oba’s income from lawful sources did not appear to be sufficient to pay for his trips to Nigeria.
 

 5. Oba gave a vague explanation about how he intended to reach his destination in Sacramento.
 

 6. Oba gave inconsistent responses to questions concerning whether he was acquainted with Amechi.
 

 7. Amechi was carrying antidiarrhea medication and a notebook containing Oba’s name and address.
 

 The totality of these circumstance is sufficient to demonstrate a reasonable suspicion that Oba was attempting to smuggle narcotics into the United States in his alimentary canal. Oba misrepresented the number of trips he had taken to Nigeria. It was reasonable for the officers to conclude, from Oba’s vague and false responses, that he did not have lawful, full-time employment, and that the expense for making several trips to Nigeria within a four-month period were paid for from proceeds derived from smuggling narcotics into the United States. Oba’s initial false denial that he knew Amechi reasonably supports a suspicion that they were acting in concert, and that the antidiarrhea medication was intended to assist Oba in delaying nor
 
 *1129
 
 mal bodily functions until he had reached his destination. The district court did not err in concluding that reasonable suspicion justified the detention of Oba until he had a bowel movement.
 

 B.
 
 Validity of Oba’s Oral Consent to the X-Ray
 

 Oba contends that his oral consent and his subsequent written consent to an x-ray examination were involuntary. Whether a person’s consent to a search was voluntarily made is a question of fact which we review under the clearly erroneous standard.
 
 United States v. Castillo,
 
 866 F.2d 1071, 1082 (9th Cir.1989).
 

 Special Agent Dinkins testified that Oba orally consented to a search at approximately 3:00 p.m. Oba testified that he refused to consent without the advice of counsel. As noted earlier, we find that the district court’s acceptance of the officers’ version of the facts was not clearly erroneous. The testimony of Special Agent Din-kins demonstrates that Oba’s oral consent to an x-ray examination was voluntary.
 
 See Castillo,
 
 866 F.2d at 1081 (execution of a written consent form is not necessary where the facts show that an oral consent was voluntary).
 

 In this matter, however, the customs officers did not act upon Oba’s oral consent because of departmental regulations. Instead, the customs officials did not cause an x-ray examination to be conducted until Oba had signed a written consent form. Accordingly, we next examine Oba’s challenge to the validity of the written consent.
 

 C.
 
 Admissibility of the Written Consent to an X-Ray Examination and Oral Statements
 

 Oba also asserts that his written consent to an x-ray examination and his oral statement were inadmissible because he requested the opportunity to consult an attorney before waiving his constitutional rights. We review
 
 de novo
 
 the question whether the words used by a defendant constituted a request for counsel.
 
 Robinson v. Borg,
 
 918 F.2d 1387, 1390 (9th Cir.1990), ce
 
 rt. denied,
 
 — U.S. —, 112 S.Ct. 198, 116 L.Ed.2d 158 (1991). We review the district court’s factual findings for clear error.
 
 United States v. Ramos,
 
 923 F.2d 1346, 1356 (9th Cir.1991). Viewing the evidence in the light most favorable to the Government, as prevailing party on the district court’s credibility determination, Oba informed the customs officers that he would consent to an x-ray examination, but would not sign a consent form until he had consulted a lawyer. Oba stated that he wanted to take legal action against the United States Customs Service when the x-rays showed that he had not imported any narcotics.
 

 Oba argues that pursuant to
 
 Edwards v. Arizona,
 
 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the officers were required to cease their interrogation once he requested counsel. In
 
 Edwards v. Arizona,
 
 the Supreme Court instructed that “when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.”
 
 Id.
 
 at 484, 101 S.Ct. at 1884. The Court also held that “an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.”
 
 Id.
 
 at 484-85, 101 S.Ct. at 1884-85.
 

 In
 
 Connecticut v. Barrett,
 
 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), the Supreme Court held that the
 
 Edwards
 
 rule requiring that all questioning cease when an accused requests counsel is not applicable where the police have respected a limited exercise of the right to counsel.
 
 Id.
 
 at 527-530, 107 S.Ct. at 831-32. The Court explained this distinction as follows:
 

 But we know of no constitutional objective that would be served by suppression in this case. It is undisputed that [the defendant] desired the presence of counsel before making a written statement. Had the police obtained such a statement
 
 *1130
 
 without meeting the waiver standards of
 
 Edwards,
 
 it would clearly be inadmissible. The defendant’s limited requests for counsel, however, were accompanied by affirmative announcements of his willingness to speak with the authorities. The fact that officials took the opportunity provided by [the defendant] to obtain an oral confession is quite consistent with the Fifth Amendment.
 

 Id.
 
 at 529, 107 S.Ct. at 832.
 

 In the instant matter, at approximately 3:00 p.m., Oba was asked if he would consent to an x-ray examination. He was not asked to make a statement concerning any alleged criminal activity. Thus, the police were not required to advise him of his constitutional rights, or of his right to refuse to submit to an x-ray examination.
 
 See Schneckloth v. Bustamonte,
 
 412 U.S. 218, 231, 93 S.Ct. 2041, 2049, 36 L.Ed.2d 854 (1973) (“it would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning”).
 

 Oba orally consented to an x-ray examination but informed the police he would not sign a written consent form without the advice of counsel concerning his right to bring a civil action. The customs officers respected Oba’s request and told him that they would simply wait until he had a bowel movement. Oba’s request for counsel was limited to advice concerning the effect of signing a consent form on a potential civil action against the United States Customs Service. He did not request the right to have the assistance of counsel during any further interrogation.
 

 When Oba was told that he was going to be taken to a medical facility for observation until he had a bowel movement, Oba then requested that he be given an x-ray examination and told the customs officers he would sign a consent form.
 

 The facts presented by the Government, and found credible by the district court, demonstrated that the customs officers did not violate the
 
 Edwards
 
 requirement that all questioning cease when a suspect invokes his right to counsel. After Oba made a request that he receive the advice of counsel prior to signing a consent form, the officers told him there would not be an x-ray examination. Thereafter, Oba initiated further discussion concerning the performance of an x-ray examination. Oba asserts that “[t]o accept the agent’s version, which appears to fit neatly into the facts of
 
 Barrett,
 
 would require acceptance of the idea that a person who had swallowed 70 foreign objects would believe that these would not show up on an x-ray.” This argument is answered by the reasoning in
 
 Barrett:
 
 “The fact that some might find [the defendant’s] decision illogical is irrelevant, for we have never ‘embraced the theory that a defendant’s ignorance of the full consequences of his decisions vitiates their voluntariness.’ ” 479 U.S. at 530, 107 S.Ct. at 832 (quoting
 
 Oregon v. Elstad,
 
 470 U.S. 298, 316, 105 S.Ct. 1285, 1296, 84 L.Ed.2d 222 (1985)).
 

 The district court also did not err in refusing to suppress Oba’s oral confession. Following Oba’s arrest after the x-ray revealed foreign objects in his alimentary canal, the officers advised him of his constitutional rights. Oba signed a waiver form and gave an oral statement. Thus, his confession was admissible.
 

 At the suppression hearing, the prosecutor advised the district court that the day after Oba made his oral statement, Oba asked the officers “when do I get to talk to a lawyer.” Thereafter, Oba gave the police a written statement. The prosecutor informed the Court that it would not offer the written statement at trial because “that’s an unclear enough area.” Although we do not believe that this is an “unclear area” of the law, we do not address whether the statement was obtained in violation of
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because Oba, not the prosecution, introduced the statement in support of his own defense.
 

 Oba’s oral statements were admissible because he was advised of his constitutional rights and expressly waived them in writing. Oba has failed to demonstrate a violation of the
 
 Edwards
 
 rule. The x-ray examination was performed at his request.
 
 *1131
 
 The district court did not err in denying the motion to suppress.
 

 AFFIRMED.