**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Elizabeth GONZALEZ–RINCON, Defendant–Appellant.**

No. 93–50603.

United States Court of Appeals, Ninth Circuit.

Submitted June 8, 1994 *.

Decided Sept. 27, 1994.

* The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); Ninth Circuit Rule 34–4.

Amy Fan, Deputy Federal Public Defender, Los Angeles, CA, for defendant-appellant.

Mary Carter Andrues, Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellee.

Before: D.W. NELSON, BEEZER and KOZINSKI, Circuit Judges.

Opinion by Judge BEEZER; Concurrence by Judge KOZINSKI; Dissent by Judge D.W. NELSON

BEEZER, Circuit Judge:

Elizabeth Gonzalez–Rincon ("Gonzalez") appeals from the judgment entered upon her conviction for possession of cocaine with intent to distribute, 21 U.S.C. § 841(a)(1), and importation of cocaine, 21 U.S.C. §§ 952(a) and 960. She argues that the district court erred in denying her motion to suppress cocaine seized after she was detained at the border for a monitored bowel movement. She also argues that the district court erred in denying her motion for a new trial, based on the government's failure to disclose impeachment evidence prior to trial, and in refusing to admit into evidence her husband's death certificate. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

I

On March 10, 1993, Gonzalez arrived at Los Angeles International Airport on a flight from Bogota, Colombia, via Mexico City. A United States Customs inspector monitoring incoming passengers noticed Gonzalez because she was wearing a bulky overcoat, unlike other passengers on her flight, and was carrying only one piece of luggage and a purse. When questioned, Gonzalez stated that she was from Colombia and was visiting the United States for 15 days. She was then referred to a secondary customs examination.

A second customs inspector requested Gonzalez's passport, customs declaration form and airline ticket. Her passport and declaration form were in the name "Auriestela Davilla de Ravachi" and the declaration form listed an address of 15755 Pocono Street in La Puente, California. The inspector noted that Gonzalez purchased her ticket with cash on March 5, 1993 for a flight on March 5 and that her passport reflected numerous entries into the United States. He also noted that she was perspiring profusely and appeared nervous.

When asked her profession, Gonzalez stated that she was a portrait photographer. She could not, however, describe the type of camera she used other than to say that it was a "very big" Canon that used 35 millimeter film. She produced a laminated card indicating she was a media photographer but she carried only a small pocket camera. When asked why she came to the United States, she first stated that she was here to attend her sister's wedding. Later, however, Gonzalez stated that her sister was already married and that she was here to help with her sister's children. She did not have her sister's telephone number, and her sister did not meet her at the airport.

Based on this interview and on a search of her luggage, the Customs inspectors decided to conduct a patdown search and a partial strip search of Gonzalez to determine if she was carrying narcotics. During the strip search, the inspectors instructed Gonzalez to perform several knee squats and felt her groin area through her underwear to determine if she was concealing drugs. None were found. At the inspectors' request, Gonzalez consented to be x-rayed. She was handcuffed and transported to an airport hospital, where she was given a urine test that indicated she was pregnant. The attending physician advised that Gonzalez not be x-rayed. She was then detained for a monitored bowel movement.

After several hours and attempts at bowel movements, Gonzalez reported that she had passed blood. The physician examined Gonzalez's anal cavity and felt a hard object. Gonzalez then confessed that she was carrying cocaine in her rectum and alimentary canal and signed a consent form permitting the physician to remove from her rectum two blue cylinder-shaped objects containing cocaine. She eventually expelled 73 balloons of cocaine. In total, Gonzalez smuggled 1005 grams of cocaine in her rectum and alimentary canal.

Gonzalez moved to suppress the cocaine, arguing that the inspectors lacked reasonable suspicion to conduct the strip search and to detain her for monitored bowel movements. The district court denied the motion.

Gonzalez's trial commenced on June 1, 1993. On June 2, Gonzalez took the stand and claimed duress. She testified that her husband had been murdered in July 1992, that he owed a debt to his murderers, and that his murderers threatened to kill Gonzalez's children if she did not smuggle cocaine into the United States to repay her husband's debt. She testified that the alleged murderers contacted her for the first time in December 1992 and that she received the passport in the name of Auriestela Davilla de Ravachi for the first time in March 1993, shortly before her trip to the United States.

Following Gonzalez's testimony on direct examination, prosecutors obtained copies of computer records from an Immigration and Naturalization Service ("INS") agent revealing that a person using a passport in the name of Auriestela Davilla de Ravachi had entered the United States through Los Angeles on November 20, 1992, and had completed a declaration form with the address of 15755 Pocono Street in La Puente, California. The prosecutors discovered that a customs inspector had been in possession of the declaration form since at least March 1993. They obtained the form from him on June 3. The government then disclosed the form to Gonzalez's defense counsel.

On the following day, June 4, Gonzalez stated under cross-examination that she did not enter the United States using the name "Auriestela Davilla de Ravachi," or any other name, on November 20, 1992. In rebuttal, the government moved to admit the November 20, 1992 declaration form and called as witnesses the INS agent and a handwriting expert to establish that the form had been completed by a person with handwriting identical to that of Gonzalez. Gonzalez objected to the document's admission under Rule 16 of the Federal Rules of Criminal Procedure. Her objection was overruled.

On the afternoon of June 3, at the government's request and in the presence of defense counsel, the INS agent conducted an infrared examination of the passport Gonzalez had used during her March 1993 entry. On June 4, the agent testified that when the passport was placed under a black light, illumination of the ink used on an INS entry stamp revealed that the stamp had been altered to read November 20, 1990. Defense counsel sought a continuance to prepare for the witness' cross examination and to consult an infrared expert. The district court denied the request.

During redirect examination of Gonzalez, her counsel attempted to introduce her husband's death certificate to establish the cause, date and time of his death. The government objected to the certificate's admission on the grounds that it lacked authentication and foundation, and contained hearsay. The district court sustained the objection on the basis that questions regarding the death certificate, which was not offered into evidence on Gonzalez's direct examination, were not proper on redirect.

Gonzalez moved for a new trial, arguing that the government had violated Rule 16 of the Federal Rules of Criminal Procedure by failing to disclose to her the impeachment evidence until the day before its admission at trial. She also argued that the district court erred in denying her request for a continuance and in refusing to admit the death certificate. The district court denied her motion. Gonzalez timely appealed.

## II

Gonzalez argues that her detention for monitored bowel movements constituted an unreasonable search and seizure under the Fourth Amendment because the customs inspectors lacked reasonable suspicion that she was an alimentary canal smuggler. She argues that the inspectors' failure to find evidence of drugs during her strip search should have allayed their suspicions, rather than have given rise to suspicion of internal smuggling. Gonzalez contends that reasonable suspicion of alimentary canal smuggling could be found only if certain additional factors were present in her case that supported reasonable suspicion in other cases. *See, e.g., United States v. Oba,* 978 F.2d 1123, 1126 (9th Cir.1992) (defendant possessed antidiarrheal and motion sickness medication); *United States v. Chukwubike,* 956 F.2d 209, 210 (9th Cir.) (antidiarrheal medicine), *cert. denied,* — U.S. —, 112 S.Ct. 2288, 119

L.Ed.2d 212 (1992); *United States v. Handy,* 788 F.2d 1419, 1420 (9th Cir.1986) (lubricant, dental floss and anti-laxative); *see also United States v. Montoya de Hernandez,* 473 U.S. 531, 534, 105 S.Ct. 3304, 3306, 87 L.Ed.2d 381 (1985) (during strip search inspector felt abdomen area and noticed firm fullness; also, defendant was wearing two pairs of elastic underpants with paper towel in crotch). She also argues that without such additional factors, her detention was based on no more than classic drug courier profile factors, insufficient to support reasonable suspicion. *See United States v. Rodriguez,* 976 F.2d 592 (9th Cir.1992), *amended,* 997 F.2d 1306 (1993).

■ We review de novo whether a border detention is based on reasonable suspicion. *Oba,* 978 F.2d at 1128. We accept the district court's findings of fact unless they are clearly erroneous. *Id.* at 1125. When evaluating a border search, we view "as a whole all factors that would be considered by an experienced and prudent customs inspector." *Handy,* 788 F.2d at 1421. Detention for a monitored bowel movement is justified if customs officers have a "particularized and objective basis for suspecting the particular person of alimentary canal smuggling." *Oba,* 978 F.2d at 1128 (internal quotations omitted).

■ The following facts were known to the customs inspectors when they detained Gonzalez for an x-ray and monitored bowel movements: Gonzalez was traveling from a known "source city" for narcotics. She paid cash for her ticket, which was purchased on the day of the flight, and carried only one piece of luggage despite stating that she planned to stay in the United States for 15 days. She gave inconsistent explanations for the purpose of her trip and an implausible description of her occupation. She presented a passport reflecting several entries into the United States. She also appeared nervous and perspired heavily throughout the interview.

Based on these facts, the customs inspectors possessed reasonable suspicion of drug smuggling sufficient to support a detention for monitored bowel movements.

We specifically reject Gonzalez's contention that the customs officers justified her detention on no more than a mere incantation of classic courier profile evidence. The customs inspectors based their suspicion on several factors they learned through interviewing her that were not consistent with innocent travel. These factors include her nervous demeanor and her lies about the purpose of her trip and her occupation, which are not easily susceptible to rote profile recitations. *See United States v. Rodriguez–Sanchez,* 23 F.3d 1488, 1493 (9th Cir.1994).

■ We also reject Gonzalez's argument that the customs inspectors needed additional factors to reasonably suspect that she was smuggling narcotics in her alimentary canal. That the facts of this case differ from those of other cases in this circuit is not conclusive. "[O]ur duty is to look at the totality of the circumstances of each case." *Oba,* 978 F.2d at 1128 (citation omitted). Although possession of certain paraphernalia or other indications of internal smuggling are persuasive factors, they are not necessary to support reasonable suspicion of alimentary canal smuggling. The ingestion of drug-filled balloons has become a "common smuggling device" for smugglers from countries such as Colombia, a principal source of illicit narcotics. *United States v. Reyes,* 821 F.2d 168, 168–69 (2d Cir.1987), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988). Alimentary canal smuggling "appears to be a relatively recent addition to the smugglers' repertoire of deceptive practices, and it also appears to be exceedingly difficult to detect." *Montoya de Hernandez,* 473 U.S. at 538, 105 S.Ct. at 3308. Once an experienced customs officer reasonably suspects that a traveler is smuggling narcotics, failure to find that she is carrying the drugs externally may give rise to suspicion that she is carrying them in her rectum or alimentary canal. *See United States v. Onumonu,* 967 F.2d 782, 789 (2d Cir.1992) (evidence that defendant was nervous, sweating profusely, traveling from a source country and declined to be x-rayed was sufficient to establish reasonable suspicion of alimentary canal and rectal smuggling); *United States v. Oyekan,* 786 F.2d 832, 834 (8th Cir.1986) (even though strip

search revealed no evidence of drugs or paraphernalia associated with alimentary canal smuggling, reasonable suspicion supported detention for x-ray and monitored bowel movements of two women from source country who carried small amount of luggage, paid cash for tickets and told implausible stories about their purpose for traveling to the United States).

Our decision is influenced by the fact that Gonzalez's search took place at our nation's border, which holds a special place in Fourth Amendment jurisprudence " 'pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country.' " *United States v. Sandoval Vargas,* 854 F.2d 1132, 1134 (9th Cir.) (quoting *United States v. Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977)), *cert. denied,* 488 U.S. 912, 109 S.Ct. 270, 102 L.Ed.2d 257 (1988). Congress has conferred broad authority on customs officers to search all persons coming into the United States from foreign countries. 19. U.S.C. § 1582; *see* 19 C.F.R. § 162.6 (1993).[1] A traveler crossing an international boundary may reasonably be required "to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in." *Carroll v. United States,* 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). Thus, at the border one's expectation of privacy is less than in the interior and the Fourth Amendment balance between the government's interests and the traveler's privacy rights is "struck much more favorably to the Government." *Montoya de Hernandez,* 473 U.S. at 539–40, 105 S.Ct. at 3309 (citations omitted).

■ Routine searches of persons at the border "are not subject to any requirement of reasonable suspicion, probable cause or

warrant." *Id.* at 538, 105 S.Ct. at 3309; *see* 19 C.F.R. § 162.6. Such searches are deemed reasonable under the Fourth Amendment " 'by the single fact that the person or item in question has entered into our country from outside.' " *Sandoval Vargas,* 854 F.2d at 1134 (quoting *Ramsey,* 431 U.S. at 619, 97 S.Ct. at 1980). Because "a port of entry is not a traveler's home ... [h]is right to be let alone neither prevents the search of his luggage nor the seizure of unprotected, but illegal, materials when his possession of them is discovered." *United States v. Thirty–Seven Photographs,* 402 U.S. 363, 376, 91 S.Ct. 1400, 1408, 28 L.Ed.2d 822 (1971). Strip searches and body-cavity searches are of course considered nonroutine, and, unlike luggage searches and patdowns, must be supported by reasonable suspicion. *Montoya de Hernandez,* 473 U.S. at 541, 105 S.Ct. at 3310. Once customs officials reasonably suspect that an international traveler is smuggling contraband, however, they may detain her and perform the searches necessary to either verify or dispel the suspicion that she "will introduce a harmful agent into this country." *Id.* at 544, 105 S.Ct. at 3312.

The customs inspectors reasonably suspected Gonzalez of attempting to smuggle narcotics across our nation's border. They were permitted under the Fourth Amendment to conduct a reasonable search to either verify or dispel their suspicion. The scope of this search included detaining her for an x-ray or for monitored bowel movements as necessary. Because Gonzalez's detention did not violate the Fourth Amendment, the district court properly denied her motion to suppress.[2]

### III

Gonzalez argues that the government violated Rule 16 of the Federal Rules of Crimi-

---

**1.** Much has been made of the fact that the first customs statute, Act of July 31, 1789, ch. 5, 1 Stat. 29, 43, which permitted the warrantless search of vessels on the mere suspicion of illegal importation of goods, was enacted by the same Congress that proposed the adoption of the Fourth Amendment, thus indicating "that the members of that body did not regard searches and seizures of this kind as 'unreasonable,' and they are not embraced within the prohibition of the amendment." *Boyd v. United States,* 116 U.S. 616, 623, 6 S.Ct. 524, 528, 29 L.Ed. 746

(1886); *see also United States v. Ramsey,* 431 U.S. 606, 616–17, 97 S.Ct. 1972, 1978–79, 52 L.Ed.2d 617 (1977).

**2.** Our holding that the facts supported reasonable suspicion of alimentary canal smuggling naturally subsumes Gonzalez's argument that the inspectors lacked reasonable suspicion to perform a strip search. We therefore do not consider this argument separately.

nal Procedure by failing to disclose to her the November 20, 1992 customs declaration form until the day before it was introduced as rebuttal evidence at trial.

Upon the defendant's request, the government must disclose to her "any relevant written or recorded statements made by the defendant" or any documents "material to the preparation of the defense" that are "within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government." Fed.R.Crim.P. 16(a)(1)(A), (C). The prosecutor is "deemed to have knowledge of and access to anything in the possession, custody or control of any federal agency participating in the same investigation of the defendant." *United States v. Bryan,* 868 F.2d 1032, 1036 (9th Cir.), *cert. denied,* 493 U.S. 858, 110 S.Ct. 167, 107 L.Ed.2d 124 (1989). We review the district court's discovery rulings under Rule 16 for an abuse of discretion and its legal construction of the rule de novo. *United States v. Mandel,* 914 F.2d 1215, 1219 (9th Cir.1990). To prevail on appeal, Gonzalez must show not only that the district court abused its discretion, but that the abuse resulted in prejudice to her substantial rights. *See United States v. Michaels,* 796 F.2d 1112, 1115 (9th Cir. 1986), *cert. denied,* 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987).

■ The relevance of the customs declaration form was inextricably tied to Gonzalez's duress defense. Specifically, the form was relevant to her statements that the men who allegedly coerced her to smuggle cocaine contacted her for the first time in December 1992 and did not give her the passport in the name of Auriestela Davilla de Ravachi until March 1993. Because the declaration form was offered only as impeaching evidence after Gonzalez testified, it was not a "relevant statement" within the meaning of Rule 16. *See United States v. Bailleaux,* 685 F.2d 1105, 1114 (9th Cir.1982); *see also United States v. Gleason,* 616 F.2d 2, 25 (2d Cir.

1979), *cert. denied,* 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767, *and cert. denied sub nom. Carter v. United States,* 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980) ("The Government is not obligated by Rule 16(a) to anticipate every possible defense, assume what the defendant's trial testimony . . . will be, and then furnish him with otherwise irrelevant material that might conflict with his testimony."). The district court did not abuse its discretion in admitting the declaration on rebuttal.[3]

## IV

■ Gonzalez also contends that the district court erred in denying her motion for a continuance when the government introduced results of an infrared test to establish that the INS entry stamp on the passport she used had been altered to conceal the November 20, 1992 entry.

"The decision to grant or deny a requested continuance lies within the broad discretion of the district court, and will not be disturbed on appeal absent clear abuse of that discretion." *United States v. Flynt,* 756 F.2d 1352, 1358, *amended,* 764 F.2d 675 (9th Cir.1985). "To reverse a trial court's denial of a continuance, an appellant must show that the denial prejudiced [her] defense." *United States v. Lewis,* 991 F.2d 524, 528, *amended,* (9th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 216, 126 L.Ed.2d 172 (1993). She must also set forth the substance of the witness testimony she could have obtained if given more time. *Id.*

Gonzalez argues that because the infrared test results were inculpatory evidence that adversely affected her defense, the district court should have granted a continuance so that her attorneys could prepare cross-examination and find an expert witness. She does not, however, establish the substance of any expert testimony she may have obtained had the district court granted her request for a continuance. *See United States v. Lane,* 765 F.2d 1376, 1379 (9th Cir.1985). The only prejudice Gonzalez can establish, moreover,

3. Even if the evidence was material to Gonzalez's defense, she has failed to demonstrate that its admission violated her substantial rights. The evidence was offered as rebuttal to Gonzalez's own testimony and any prejudice resulted from her own false statements. Gonzalez has no substantial right to commit perjury.

is that the infrared evidence was admitted to demonstrate that she lied about her entry into the United States. The district court did not abuse its discretion in denying the motion for a continuance.

## V

Gonzalez argues that the district court erred in refusing to admit into evidence her husband's death certificate.

■ We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Segall,* 833 F.2d 144, 148 (9th Cir.1987). We will reverse "for nonconstitutional error only if it was more probable than not that the error affected the verdict." *United States v. McAllister,* 747 F.2d 1273, 1277 (9th Cir.1984), *cert. denied,* 474 U.S. 829, 106 S.Ct. 92, 88 L.Ed.2d 76 (1985).

■ On direct examination, Gonzalez testified that she was coerced into smuggling the cocaine by men who murdered her husband, Jimeno. On cross examination, the government asked Gonzalez the date of her husband's death. She could not remember the exact date. On redirect, defense counsel attempted to introduce into evidence the death certificate of someone with the name "Jimeno Hernandez Valderrama." The certificate contained information about the date, time, place and causes of death. The district court refused to admit the certificate, concluding that it was improper evidence on redirect examination because the exact date of Jimeno's death was irrelevant and questioning regarding the death certificate did not affect Gonzalez's credibility.

We may affirm the district court's decision on any basis supported by the record. *United States v. Washington,* 969 F.2d 752, 755 (9th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1945, 123 L.Ed.2d 651 (1993). Although the government concedes that the document was properly authenticated, it argues that no foundation was laid for the certificate's admission. We agree. Gonzalez offered no evidence to establish that the person named in the death certificate was her husband. Gonzalez has failed to persuade us, moreover, that the certificate's omission more probably than not affected the verdict.

Accordingly, the judgment of the district court is

AFFIRMED.

KOZINSKI, Circuit Judge, concurring.

As our dissenting colleague points out, no one likes being pressured by strangers while performing bodily functions; it can be a degrading experience. But despite the strong implication in the dissent's opening paragraph, there is no evidence that anything like that took place here. The record reflects only that Gonzalez–Rincon was left in an examination room with a single female agent, and that she was taken to the restroom four times to attempt a bowel movement. During the last of these efforts she passed blood, at which time she was seen by a doctor who helped her remove an astonishing quantity of drugs from her alimentary canal. Nothing in the record supports the notion that Gonzalez–Rincon was required to defecate in front of others, or that anyone hurried her along or cajoled her in any way. Indeed, there is no reason to believe that Gonzalez–Rincon was subjected to embarrassment significantly greater than that endured by millions of people who use public restrooms every day. To be sure, she knew the results would be examined, and to that end she was not allowed to use a flushable toilet. But is this "necessarily more degrading" than a strip search, Dissent at 870, where the suspect is taken into a small room by total strangers and required to partially disrobe so they can pat down and examine her private parts? *See* ER 76–83.

Which is not to deny that the monitored bowel movement is an intrusive procedure, nor to suggest that it should be lightly approved. But the reasons for allowing the procedure are compelling, and they are by no means limited to effective law enforcement. To understand what's at stake, one must consider the vastly increased sophistication and persistence of those who use alimentary canal carriers to import illegal drugs into the United States. Gone are the days when body-packers could be detected by external signs, such as petroleum jelly smeared around the buttocks or the use of adult diapers. *See United States v. Montoya de Her-*

*nandez,* 473 U.S. 531, 534, 105 S.Ct. 3304, 3306, 87 L.Ed.2d 381 (1985) ("two pairs of elastic underpants"); *United States v. Cameron,* 538 F.2d 254, 256 (9th Cir.1976) ("lubricant in the rectal area"); *Huguez v. United States,* 406 F.2d 366, 370 (9th Cir.1969) ("greasy substance" on appellant's buttocks). Today's drug smuggler assiduously avoids such telltale signals; Gonzalez–Rincon herself was subjected to a close visual inspection of her anus and genital area, and then performed five knee squats, yet showed no external evidence that she was carrying drugs inside her body. RT (5/24/93) 49–50. Drugs might nevertheless be detected nonintrusively by means of x-rays, but drug lords have hit on the idea of using pregnant women who can't safely be exposed to radiation. The choice we face in cases like this is therefore simple: Subject the suspected smuggler to a monitored bowel movement or let her go.

Selecting the latter choice, as the dissent suggests we should, *see* Dissent at 870 n. 1, would have profound consequences. Not only would we be capitulating to the importation of large quantities of illegal drugs by these unseemly means, but we would also create a major incentive to use *only* pregnant women as alimentary canal carriers. The calculus for drug dealers would be straightforward enough: If you use a man as a courier and he comes under suspicion, he will be x-rayed and you can kiss your shipment good-bye; but if you use a pregnant woman, the worst that's likely to happen is that she will be put on the next plane back with the shipment intact. Given the staggering value of some of these shipments, *see* RT (6/2/93) 126–28 (street value of the cocaine Gonzalez–Rincon discharged estimated at $200,000), only the most humanitarian of drug lords would eschew pregnant women as their carriers of choice.

Even putting aside all considerations of law enforcement—though these certainly are not trivial—it strikes me as utter folly to adopt a policy that will have the effect of luring poor pregnant women into stuffing their bodies with massive quantities of dangerous drugs. Experience has shown that the containers in which drugs are carried are not foolproof; packages have been known to rupture or leak, severely intoxicating or killing the carrier. *See* Sue Leeman, *Many Nigerian Women Pay with Lives in Risky British Drug Traffic,* L.A. Times, Feb. 7, 1993, at A24. At least one pregnant woman has lost her life trying to smuggle drugs in this fashion, delivering a premature, cocaine-poisoned child as she died. *See Cocaine Baby's Condition Upgraded to Serious,* UPI, Oct. 12, 1991, *available in* LEXIS, News library, UPI file. And given that mules have been known to carry as many as one hundred separate containers of drugs at a time— Gonzalez–Rincon herself had 73 balloons and two cannisters filled with cocaine—the risk that one or more of these will leach poison into the body of the carrier is far from trivial. *See Pregnant Women Smuggle Cocaine in Stomachs,* UPI, Feb. 27, 1990, *available in* LEXIS, News library, UPI file. Such mishaps are common enough to have been the subject of commentary in medical journals. *See, e.g.,* Punit S. Ramrakha & Ian Barton, *Drug Smuggler's Delirium: Suspect Cocaine Intoxication in Travellers with High Fever and a Bizarre Mental State,* 306 Brit.Med.J. 470 (1993).

It's bad enough when adults expose themselves to these risks, but at least it is a decision they have made for themselves. A fetus, undergoing the delicate process of development—forming a nervous system, internal organs, limbs—is not only more susceptible to minute traces of drugs that might be released in the mother's body, but it also has no say in the matter. A policy that makes it good business for drug dealers to use pregnant women as carriers will vastly increase the human suffering that results from this grotesque practice, and the brunt of that suffering will fall on desperately poor women and their unborn babies.

I fully agree with the dissent's basic sentiment, which is that we must minimize the affront to human dignity that results from any contact search, including a monitored bowel movement. If the suspected courier were subjected to unnecessary indignities, such as those hypothesized in the opening paragraph of the dissent, that certainly would bear on the reasonableness of the search. *See Cameron,* 538 F.2d at 257–59

(body cavity search too intrusive). But where the suspect is simply kept under observation and asked to produce a fecal specimen, the intrusion is no more serious than necessary. Subjecting Gonzalez–Rincon to a monitored bowel movement was surely no minor intrusion, but doing otherwise would invite assaults on the dignity and safety of countless other pregnant women and their unborn infants.

We are forced to this sad choice by unscrupulous and exploitative drug smugglers, but we dare make it only one way.

D.W. NELSON, Circuit Judge, dissenting:

To sit in a room, monitored by customs inspectors or medical staff, knowing that one is not free to leave until one produces a bowel movement, is unquestionably a degrading and humiliating experience. As the majority acknowledges, the Supreme Court has held that border officials may detain a traveler for a monitored bowel movement search only when, at the inception of the detention for the search, they have " 'a particularized and objective basis for suspecting the particular person' of alimentary canal smuggling." *United States v. Montoya de Hernandez,* 473 U.S. 531, 541, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381 (1985) (internal citation omitted); *see also id.* at 540, 105 S.Ct. at 3309 (stating that border officials must have "particularized suspicion that the evidence sought might be found *within the body of the individual*") (emphasis added). Because I believe that the decision by the majority threatens to eviscerate this requirement, significantly increasing the likelihood that innocent travelers seeking entry or re-entry to the country will be subjected to the degradation of such a search, I dissent.

I.

The majority opinion expands Ninth Circuit law in two significant and unwarranted respects. First, the majority appears to read *Montoya de Hernandez* broadly for the proposition that evidence merely giving rise to a suspicion that a traveler might be engaged in some form of illicit activity is sufficient to justify subjecting the traveler to a monitored bowel movement search. Second,

the majority embraces the government's theory that, even if the evidence possessed by border officials in this case at the outset of the detention was not sufficient to justify the monitored bowel movement search, the *very failure* of the initial strip search to detect the presence of lubricant residue, reinforced undergarments, or other evidence indicative of alimentary canal smuggling provided the additional quantum of "particularized" evidence necessary to justify the monitored bowel movement search. I disagree with both propositions.

The majority first holds that the evidence that Gonzalez–Rincon had traveled from a narcotics "source city," had paid cash for her ticket, and carried only one piece of luggage, together with Gonzalez–Rincon's apparent dishonesty during questioning, justified not only the partial strip search but also the lengthy detention for the monitored bowel movement search. This ruling represents an unwarranted and, in this circuit at least, unprecedented extension of *Montoya de Hernandez.* Although I agree that, under *Montoya de Hernandez,* the officials had sufficient cause for suspicion at the outset of the detention to conduct the partial strip search, they did not have a "particularized and objective basis for suspecting [Gonzalez–Rincon] of alimentary canal smuggling." At the time the border officials detained Gonzalez–Rincon for the monitored bowel movement search, the officials had not found a single piece of evidence in any way indicative of such smuggling. As explained below, this fact distinguishes the present case both from *Montoya de Hernandez* and all previous cases decided subsequent to *Montoya de Hernandez* in this circuit.

It is well-established that, all else equal, the greater the indignity or invasion of privacy occasioned by a search, the greater the quantum of evidence necessary to justify the search. In *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), a case involving the propriety of a visual body-cavity search policy at a pretrial detention facility, the Supreme Court explained:

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.

In each case, it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559, 99 S.Ct. at 1884. *See also Montoya de Hernandez,* 473 U.S. at 537, 105 S.Ct. at 3308 ("What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.") (citing *New Jersey v. T.L.O.,* 469 U.S. 325, 327–42, 105 S.Ct. 733, 735–43, 83 L.Ed.2d 720 (1985)). Although the majority is correct to point out that, at the border, "the Fourth Amendment balance between the government's interests and the traveler's privacy rights is 'struck much more favorably to the Government,'" *supra* at 864 (quoting *Montoya de Hernandez,* 473 U.S. at 539–40, 105 S.Ct. at 3309–10), Fourth Amendment principles continue to apply. *See* 473 U.S. at 539, 105 S.Ct. at 3309 ("Having presented herself at the border for admission, and having subjected herself to the criminal enforcement powers of the Federal Government, 19 U.S.C. § 482, respondent was entitled to be free from unreasonable search and seizure."); *See also United States v. Lamela,* 942 F.2d 100, 102 (1st Cir.1991) (holding that customs officials' discovery during patdown search of "conspicuous bulge" from girdle justified a more intrusive strip search, and noting that "what constitutes 'reasonable suspicion' to justify a particular search may not suffice to justify a more intrusive or demeaning search") (internal citations omitted); *Adedeji v. United States,* 782 F.Supp. 688, 693–94 (D.Mass.1992) ("The level of suspicion [required to justify a search] necessarily depends upon the intrusiveness of the search contemplated. The law here is well settled. 'What is required to be balanced in any particular case is the level of suspicion of the agent against the level of indignity perpetrated upon the traveler.'") (quoting *United States v. Brown,* 499 F.2d 829, 833 (7th Cir.1974)). *But see Montoya de Hernandez,* 473 U.S. at 541 n. 4, 105 S.Ct. at 3310 n. 4 (declining to specify the level of

suspicion necessary for progressively more intrusive searches at the border).

The facts of *Montoya de Hernandez* are instructive. In that case, the Supreme Court ruled that evidence that the defendant had traveled from a narcotics "source city," had paid for her ticket in cash, and had little clothing, together with the defendant's nervousness and evasiveness during questioning, provided a sufficient basis for a detention beyond the scope of a routine customs search and inspection. 473 U.S. at 542, 105 S.Ct. at 3311. Prior to determining that the suspect should be subjected to a monitored bowel movement search, however, the inspectors conducted a strip search which uncovered particularized evidence sufficient to justify the more intrusive and more humiliating search. As the Court explained, "During the [patdown and strip search] the female inspector felt respondent's abdomen area and noticed a firm fullness, as if respondent were wearing a girdle. The search revealed no contraband, but the inspector noticed that respondent was wearing two pairs of elastic underpants with a paper towel lining the crotch area." *Id.* at 534, 105 S.Ct. at 3307. This latter evidence provided a "particularized" basis for the officials' suspicion that the detainee was engaged in alimentary canal smuggling.

I have found no case in this circuit in which a monitored bowel movement search at the border was upheld absent particularized evidence directly linking the traveler to possible alimentary canal smuggling, whether that evidence consisted of materials known to be "commonly used by individuals transporting substances in body cavities," *United States v. Handy,* 788 F.2d 1419, 1420 (9th Cir.1986), or observations of the detainee's physical discomfort or abnormal posture and gait, *see id.* *See generally* cases cited by majority at pp. 862–863, *supra.*

In my view, the majority's expansive reading of *Montoya de Hernandez* threatens to replace the Supreme Court's requirement that border officials have a "particularized ... basis for suspecting alimentary canal smuggling" before they order a monitored bowel movement search with a substantially watered-down requirement that border offi-

cials have grounds for suspicion of some form of illicit activity. Although drug courier profile evidence and apparent dishonesty may provide a reason to conduct a strip search or turn someone away at the border,[1] such evidence is not sufficiently particularized to justify subjecting a traveler to a humiliating monitored bowel movement search.

The majority's alternative ruling that the *very failure* of the strip search to uncover evidence indicative of alimentary canal smuggling *itself* provided the additional quantum of "particularized" evidence necessary to justify the more humiliating search, is even more misguided. The majority's reasoning appears to be that because the inspectors' initial suspicion was well-founded, their failure to find drugs in one place made it reasonable to search in another. This argument, however, presumes that the initial search was justified by probable cause, or some higher degree of informed suspicion than the suspicion that at the outset justified the partial strip search. The government should not be able to bootstrap—where a patdown or strip search reveals no particularized evidence tending to indicate alimentary canal smuggling, the evidence that originally created a reasonable suspicion that the suspect was carrying drugs must also be sufficient to create a reasonable suspicion that she was smuggling drugs *in her alimentary canal.* Here, the evidence that initially led inspectors to detain Gonzalez–Rincon consisted solely of drug courier profile evidence together with her nervousness and seeming dishon-

esty during questioning. This evidence clearly did not provide a "particularized and objective basis" for suspecting Gonzalez–Rincon of alimentary canal smuggling.

There is nothing wrong with customs inspectors moving from a less intrusive to a more intrusive search technique as long as the inspectors have reasonable grounds to justify the greater intrusion. Where the evidence at the outset of the detention gives rise to a generalized suspicion that the traveler might be engaged in illicit activity, but none of that evidence is indicative of alimentary canal smuggling, the government should not be allowed to use the negative results from a strip search to justify the necessarily more degrading monitored bowel movement search. This court has not previously endorsed such an approach, and doing so here opens the door for customs investigators to order lengthy detentions for monitored bowel movements whenever a suspect merely fits a profile and appears to be nervous or purposely evasive during questioning.

## II.

Although the majority properly makes reference to the importance of providing law enforcement officials with the tools to combat narcotics trafficking, and the difficulties of detecting alimentary canal smuggling at the border, it fails to pay sufficient heed to the principle noted by Justice Brennan in his dissent in *Montoya de Hernandez:* "The standards we fashion to govern ferreting out of the guilty apply equally to the detention of

1. Significantly, the border officials who detained Gonzalez–Rincon did not offer her the option of leaving the country on the next available flight. *Cf. Montoya de Hernandez,* 473 U.S. at 534, 105 S.Ct. at 3306 (noting that the customs inspector made such an offer, and only detained Montoya de Hernandez for the monitored bowel movement search after determining that no such flights were available). As Justice Brennan noted in his dissent, when the requirement that travelers "excrete their bodily wastes for further scrutiny," *id.* at 563, 105 S.Ct. at 3322, is not merely a possible condition of entry to the country, but a basis for incommunicado detention and possible criminal sanctions, we risk creating "an authoritarian twilight zone on the border." *Id.* at 564, 105 S.Ct. at 3323. Justice Brennan put the matter starkly but accurately: "The suspicious-looking traveler may not enter the country. Nor may he leave. Instead, he is trapped on the

border. Because he is on American soil, he is fully subject 'to the criminal enforcement powers of the Federal Government.' But notwithstanding that he is on American soil, he is not fully protected by the guarantees of the Bill of Rights applicable everywhere else in the country.... Nothing in the underlying premises of the 'border exception' supports such a ring of unbridled authoritarianism surrounding freedom's soil." *Id.* at 564–65, 105 S.Ct. at 3323 (internal citation omitted). *See also id.* at 554, 105 S.Ct. at 3317 (emphasizing that "while the power of Congress to authorize wide-ranging detentions and searches *for purposes of immigration and customs control* is unquestioned, the Court previously has emphasized that far different considerations apply when detentions and searches are carried out *for purposes of investigating suspected criminal activity* ").

the innocent, and 'may be exercised by the most unfit and ruthless officers as well as by the fit and responsible.'" 473 U.S. at 548, 105 S.Ct. at 3314 (Brennan, J., dissenting) (quoting *Brinegar v. United States*, 338 U.S. 160, 182, 69 S.Ct. 1302, 1314, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting)). Neither party to the present appeal provided the court with recent statistics on the subject, but the evidence that we do have suggests that many innocent travelers have been and will continue to be subjected to the kind of degrading search at issue in this appeal. *See id.* at 557, 105 S.Ct. at 3319 (noting that an early study suggested that "only 16 percent of women subjected to body-cavity searches at the border were in fact found to be carrying contraband," and that a physician who conducted many internal searches at the border reported finding contraband in only 15 to 20 percent of the individuals he examined).

The implicit justification for adopting a rule authorizing monitored bowel movement searches on facts such as those present in this case appears to be that alimentary canal smuggling has reached such a high degree of sophistication that, in many cases, smugglers will be able to endure customs searches, pat-downs and strip searches without border officials uncovering a single piece of evidence to ground their suspicion that the traveler is engaged in alimentary canal smuggling. In my view, before endorsing the expanded use of such degrading searches on such slender evidence, we should at a minimum require the government to come forward with statistical evidence demonstrating that the government's interest in effective enforcement of the drug laws necessitates the potentially far-reaching rule articulated by the majority. The government has presented no such evidence.

Under the standard articulated by the majority, petty government officials will be able to order monitored bowel movement searches on the basis of often unreliable drug courier profile evidence, *cf. United States v. Lui*, 941 F.2d 844, 847 (9th Cir.1991) (noting that this court has "denounced the use of drug courier profile evidence as substantive evidence of a defendant's innocence or guilt"), as long as the profile evidence is accompanied by some evidence of nervousness and self-contradictory statements or seeming evasiveness on the part of the traveler. Where the traveler is innocent, of course, it is not unlikely that, under questioning, the traveler will become nervous and provide inconsistent responses. If customs officials choose to apply the majority's standard aggressively, the lines of travelers seeking entrance to the United States who are diverted for lengthy and humiliating monitored bowel movement searches will surely grow long. Many of these travelers will be innocent. Because neither precedent nor our legitimate concern with intercepting drug traffickers justifies such a result, I respectfully dissent.