**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2667
_____

UNITED STATES OF AMERICA

v.

JAMES EUGENE ROUGHT,
Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal No. 3-18-cr-00353)
District Judge: Honorable Malachy E. Mannion
_____

Argued: June 24, 2021
_____

Before: CHAGARES, PORTER, and ROTH, <u>Circuit</u> <u>Judges</u>

(Filed: August 24, 2021)
_____

Ronald A. Krauss [ARGUED]
Quin M. Sorenson

Office of the Federal Public Defender
100 Chestnut Street
Suite 306
Harrisburg, PA 17101

     <u>Counsel for Appellant</u>

Bruce D. Brandler, Acting United States Attorney
Stephen R. Cerutti II, Assistant United States Attorney
[ARGUED]
Office of United States Attorney
228 Walnut Street, P.O. Box 11754
Federal Building and Courthouse, Suite 220
Harrisburg, PA 17108

Michelle L. Olshefski, Assistant United States Attorney
Office of United States Attorney
235 North Washington Avenue
P.O. Box 309, Suite 311
Scranton, PA 18503

     <u>Counsel for Appellee</u>

_____

OPINION OF THE COURT
_____

CHAGARES, <u>Circuit</u> <u>Judge</u>.

Defendant James Eugene Rought sold fentanyl to Dana Carichner, who provided some to Cara Giberson. Both overdosed. Giberson was revived with Narcan; Carichner

died.  Rought was indicted for possession of fentanyl with intent to distribute resulting in death and serious bodily injury.  A few days later, he was interrogated by the FBI.  After being advised of his rights verbally and in writing, he answered questions about his drug use and his supplier, but said he did not want to talk about Carichner's death without a lawyer.  The interrogating agents respected his wishes and turned the questioning to other subjects.  In discussing those other subjects, however, Rought quickly brought the conversation back around to Carichner — and then made incriminating statements.  Rought moved to suppress the statements he made to the FBI after he invoked his right to counsel.  The District Court denied the motion, the statements were used against Rought at trial, and a jury convicted him.  Rought now appeals, arguing that the court erred in denying his suppression motion and that he should receive a new trial in which the incriminating statements would not be admissible.

We will affirm.  In Connecticut v. Barrett, 479 U.S. 523 (1987), the Supreme Court held that invocations of the right to counsel during custodial interrogations can be "limited."  Id. at 529-30.  After a limited invocation, interrogation can continue on topics not covered by the invocation.  If the suspect, without prompting from law enforcement, then voluntarily reinitiates discussion of a covered topic and waives her previously invoked rights, it "is quite consistent with the Fifth Amendment" for the suspect's statements about a covered topic to be admissible at trial.  Id. at 529.  Because that is what happened in this case, the District Court correctly denied Rought's suppression motion, and he is not entitled to a new trial.

I.

3

Rought sold fentanyl to Carichner on August 13, 2018. Giberson was there and witnessed the transaction. On August 15, Giberson asked Carichner to get her some fentanyl from his source. Rought again sold fentanyl to Carichner on August 16, and the two of them used drugs together. That evening, Carichner delivered some of the fentanyl he acquired from Rought to Giberson at the Blogg, the restaurant where she worked, leaving it for her in her car. Carichner went home. After midnight, Giberson overdosed on fentanyl in the bathroom of the Blogg, but was revived with Narcan. Carichner died of a fentanyl overdose at home and in bed sometime after 2:00 a.m.

Law enforcement connected the overdoses to Rought. He was charged on October 16, 2018, in a one count indictment with distributing and possessing fentanyl with intent to distribute resulting in serious bodily injury and death. Three days later, Rought was interrogated for approximately one hour by Special Agent Larry Whitehead and Task Force Officer Shane Yelland of the FBI. The interrogation, which was videotaped and is the focus of this appeal, took place in an FBI interview room at the Scranton federal courthouse immediately prior to Rought's initial appearance on the federal charge. Rought was already in custody for state parole violations at the time of the interrogation.

At the outset, Whitehead confirmed that Rought had been arrested in the past and informed him of his Miranda rights. Whitehead also provided Rought with a written consent form describing his rights and gave Rought an opportunity to read it. Asked if he was willing to talk, Rought responded that he was, "to a point." Whitehead emphasized that Rought could "stop at any time," and that "those are the ground rules."

4

Rought then signed the consent form, which among other things provided that Rought was willing to answer questions without a lawyer present.

For the next twenty-four minutes, Rought answered questions about his drug use, his drug supplier, his criminal history, and his relationship with Carichner, among other topics. Rought insisted that he was not a drug dealer. He believed that "the situation at hand is completely blown out of proportion" and noted that he and Carichner worked together and "got high together every day." He insisted again that he did not sell drugs to Carichner. Rought explained that Carichner was his "best friend" and that they had grown up together. Whitehead told Rought the interview was about understanding "both sides" of what happened, because law enforcement only had one side of the story so far. Rought responded that "really you don't know any side" because Giberson (who claimed to have seen Rought sell drugs to Carichner and whose name was "on the paperwork") "wasn't even there" and Rought "couldn't even tell you what this chick looked like." Whitehead commented that "a tragedy resulted from your actions . . . and not just yours. . . . this is what's going on daily in the community."

Whitehead told Rought that the federal criminal justice system can be "unforgiving" for violent crimes, but that it "rewards cooperation," and that the FBI was interested in Rought's suppliers. Rought explained that his primary supplier went by "L.B." and that Rought would buy from him in Wilkes-Barre. If L.B. was unavailable, Rought would connect with other "random" suppliers in the area in order to meet the needs of his addiction — three or four bundles of fentanyl per day at that point. Rought explained that he would buy a brick

5

of fentanyl from L.B. in order to get bulk pricing, and then "split it" with the people he got high with, including Carichner. Because he worked with Carichner "every day . . . most days we would split it." Rought also said that the quality of the drugs was "really good since somebody died." Whitehead asked Rought "why fentanyl?" Rought explained that it was "what we wanted" because, at that time, state parole drug tests did not test for fentanyl. Rought told Whitehead that L.B. was always on the lookout for guns, and would trade drugs for guns. One person who traded guns to L.B. was Stan Derby, a friend of Rought's that died of an overdose, "probably" from drugs he acquired from L.B.

Rought and Whitehead discussed how Wilkes-Barre was a "cesspool" of drug dealing and how society is "plagued" by drugs and addiction. Whitehead emphasized his understanding that addiction is a difficult lifestyle to escape and brought up drug rehabilitation programs with Rought. Rought said he was once able to stop using drugs for a week after coming home from a five-day detox program, but began using them again because many of the people around him were using drugs, including Carichner.

About twenty-four minutes into the interrogation, after Rought mentioned Carichner's drug use, Whitehead asked, "So let's talk about Dana [Carichner]. What happened there?" Rought replied, "I mean, I don't really want to talk about that aspect without my lawyer. . . . That's a serious situation. I mean, they're trying to roof me."[1] Whitehead immediately responded that he understood and that "those are the ground

_____

[1] There is no dispute that, as used here, to "roof" someone means to put that person in prison for a long time.

6

rules. . . . That's your right, and I respect that."

Whitehead then turned the conversation back to L.B. and reiterated that he was interested in the people "above" Rought. He explained that people "caught in a bad spot," like Rought, could help themselves and also help law enforcement "clean up the community." Whitehead then referenced Rought's previous comment that his friend Stan Derby had overdosed. That prompted Rought to acknowledge the toll that drug addiction had taken on those around him, including the lives of several friends and acquaintances who died of overdoses; Rought said "you're not losing the effect on me." Whitehead responded that he understood that toll and reiterated that he wanted Rought to share information that would help law enforcement in "going up the ladder" after L.B. and "whoever else there is."

In response, and just a few minutes after invoking his right to counsel, Rought stated that he did not like addiction any more than Whitehead and that drug dealers are "killing my friends just as much as, right now, you're trying to say that I killed my friend [Carichner]." Whitehead responded that he was not saying that Rought killed Carichner but that Rought "had a role and that's unfortunate, it is." He noted that Rought must "feel like shit" about Carichner's death, to which Rought responded, "Absolutely." Whitehead informed Rought that he did not believe Rought had "intent or malice" and that Carichner's death was an "unfortunate tragedy." Rought then expressed anger about how he was being treated like a drug dealer when he did not sell drugs. He asked "[j]ust because somebody that I worked with also got high and we got high together . . . how is that a crime? . . . [H]ow am I being charged with serious bodily injury [and] death?" Rought expressed

7

incredulity that "the same dope that he snorted a bag of and died, I shot ten bags of right next to him." He also explained that he initially did not believe that Carichner had overdosed because it did not make sense that Carichner "got high, drove all the way home, 25-30 minutes, and then got into bed, and then died."

Whitehead commented that "we have to work through this . . . . The three of us, the prosecutor, and your attorney. . . . This is set in motion." He acknowledged that Rought was in a "shitty situation." Rought said he recognized that fact as soon as he learned "that I got . . . a fed case on Facebook." Yelland then steered the conversation back to L.B. by asking if L.B. used Facebook. The remainder of the interrogation focused on L.B. At one point, Whitehead offered to question Rought about L.B. with a lawyer present. Rought did not express interest in this suggestion, and continued answering questions about L.B. until he was brought before the District Court for his initial appearance.

In May 2019, Rought moved to suppress his post-invocation statements on the ground that they were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966). The Government filed a superseding indictment against Rought the following month; it added one count of conspiracy to possess fentanyl with intent to distribute and one count of aiding and abetting the distribution of fentanyl. Rought pleaded not guilty to all three counts. The District Court denied Rought's suppression motion, concluding that Rought's invocation of the right to counsel was limited to the circumstances of Carichner's death, that law enforcement "should [not] have reasonably anticipated" that discussing L.B. and Derby's overdose would prompt Rought to "renew discussions about"

8

Carichner, and that Rought knowingly and voluntarily waived his right not to speak about Carichner without a lawyer present. Appendix ("App.") 97-99.

At trial, the Government made frequent use of Rought's post-invocation statements. The Government, for instance, told the jury in its opening statement that they would "actually hear the defendant admitting to . . . drug dealing." App. 190. Among other uses, the video of the interrogation was played during Agent Whitehead's testimony, and the Government's closing arguments referred back to Rought's statements. The jury convicted Rought on all counts, and he was sentenced to 360 months in prison. Rought timely appealed.

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231, and we have appellate jurisdiction under 28 U.S.C. § 1291. We review the denial of a motion to suppress for clear error as to the facts that the District Court found and exercise plenary review over the application of law to those facts. United States v. Davis, 726 F.3d 434, 439 (3d Cir. 2013).

## III.

Rought argues that the District Court erred in denying his motion to suppress for three reasons. First, Rought argues that his invocation of the right to counsel was not limited to the circumstances of Carichner's death but was instead without limitation and that law enforcement was therefore required to cease interrogation entirely under Edwards v. Arizona, 451 U.S. 477 (1981). Second, Rought argues that after he invoked his right to counsel, he did not initiate the post-invocation

9

discussion about Carichner. Third, Rought argues that any post-invocation waiver of the right to counsel was not knowing and intelligent because he was not "fully aware" of the potential consequences, including the risk — which came to pass — that he was opening himself up to conspiracy charges. Rought Br. 26. We will below elucidate the relevant legal principles, and then consider Rought's arguments in light of those principles.

A.

The Fifth Amendment provides that "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To safeguard this right, the Supreme Court in Miranda "imposed certain obligations on police in custodial interrogations, in order to dissipate the 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" United States v. Velasquez, 885 F.2d 1076, 1084 (3d Cir. 1989) (quoting Miranda, 384 U.S. at 467). The familiar Miranda warnings require police to "inform the suspect of his right to remain silent and his right to have counsel present during interrogation, as well as their intent to use his statements to secure a conviction." Id. Police must also "cease the interrogation if at any point the suspect indicates that he wishes to remain silent or that he wants an attorney." Id.

In Edwards, the Supreme Court established a bright-line rule for suspects who have invoked the right to counsel: "an accused person in custody who has invoked his desire not to speak until he has conferred with counsel 'is not subject to further interrogation . . . until counsel has been made available

10

to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" Id. (quoting Edwards, 451 U.S. at 484-85). If a suspect who has invoked the right to counsel but not yet met with counsel initiates discussion with the authorities, further interrogation[2] can take place. Id. at 1084, 1087. Post-invocation statements made during that interrogation may then be admissible against the suspect at trial if the suspect knowingly and voluntarily waives the right to counsel and the right to remain silent. Id.; see also Oregon v. Bradshaw, 462 U.S. 1039, 1045-46 (1983) (plurality opinion); Edwards, 451 U.S. at 486 n.9.

In Bradshaw, the Court split 4-4 on what it means for a suspect to "initiate" discussion following an invocation of the right to counsel. The plurality held that the suspect in the case before it initiated discussion where his question — "Well, what is going to happen to me now?" — "evinced a willingness and a desire for a generalized discussion about the investigation." 462 U.S. at 1045-46. The dissenters would have held that initiation requires "communication or dialogue about the subject matter of the criminal investigation." Id. at 1053 (Marshall, J., dissenting) (emphasis omitted). In Velasquez, this Court adopted the Bradshaw plurality's test for initiation, holding "that an initiation occurs when a suspect initiates a conversation evincing a willingness and a desire for a

---

[2] Under Miranda, "the term 'interrogation' . . . refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (footnote omitted).

11

generalized discussion about the investigation." 885 F.2d at 1085 (cleaned up). Initiation and waiver are distinct analytical steps; initiation by itself is not adequate to find a waiver. Id. at 1087.

A waiver of the Miranda rights must be voluntary, knowing, and intelligent considering the totality of the circumstances. Id. at 1086 (citing Miranda, 384 U.S. at 444). A waiver is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Colorado v. Spring, 479 U.S. 564, 573 (1987) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). In the voluntariness inquiry, "[a] suspect's background and experience, including prior dealings with the criminal justice system, should be taken into account." United States v. Jacobs, 431 F.3d 99, 108 (3d Cir. 2005). A waiver is knowing and intelligent if "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." Spring, 479 U.S. at 573 (quoting Burbine, 475 U.S. at 421); see also Berghuis v. Thompkins, 560 U.S. 370, 382-83 (2010). If the Government "shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Berghuis, 560 U.S. at 384.

In sum, then, a suspect who has invoked the right to counsel and has not yet met with counsel is generally not subject to further interrogation unless the suspect initiates discussion with law enforcement. Once there has been an initiation, further interrogation can take place, and the suspect's statements may be admissible against him at trial if he validly waives the right to remain silent and the right to

12

counsel.  See Velasquez, 885 F.2d at 1084-89.

Or at least, these are the principles that generally apply after a suspect invokes the right to counsel "for all purposes." Barrett, 479 U.S. at 530.  A key premise of the decisions discussed above is that a suspect's invocation of the right to counsel reflects a "desire to deal with the police only through counsel."  Edwards, 451 U.S. at 484.  The Supreme Court recognized in Barrett, however, that not all invocations reflect such a desire.  The defendant in Barrett refused "to put anything in writing until his attorney came," but was willing to offer an oral confession despite knowing that police planned to record it on tape.  479 U.S. at 525-26.  The Court held that Barrett's oral statements were admissible, reasoning that nothing "requires authorities to ignore the tenor or sense of a defendant's response to [Miranda] warnings."  Id. at 528.  If police had obtained a written statement without complying with Edwards, it would "clearly" have been inadmissible, but it was "quite consistent with the Fifth Amendment" for law enforcement to make use of "the opportunity provided by Barrett to obtain an oral confession."  Id. at 529.

The invocation in Barrett was limited by the mode of the suspect's communications:  written statements were within the invocation while oral statements were not.  But the Court's reasoning in Barrett is not limited to mode.  It applies with equal force to invocations limited by topic or subject matter, and we now hold that suspects can limit their invocations of the right to counsel in this manner.[3]  Numerous federal and

---

[3] We caution, however, that the Barrett decision creates only a narrow exception to the Edwards rule, and that it is appropriate to give ambiguous invocations of the right to

13

state courts have likewise relied on the Barrett decision to find that an invocation was limited by topic or subject matter. See, e.g., United States v. Oba, 978 F.2d 1123, 1130 (9th Cir. 1992) (concluding that invocation was limited to advice of counsel concerning effect of x-ray consent form on potential civil action); United States v. Ivy, 929 F.2d 147, 152-53 (5th Cir. 1991) (determining that invocation was limited to questions about where defendant obtained materials to make a bomb); United States v. Conner, 946 F.2d 896, 1991 WL 213756, at *1-2 (6th Cir. 1991) (affirming finding that invocation was limited to "narcotics activity" and did not cover other investigative topics); United States v. Mikelic, No. 3:10-cr-132, 2011 WL 4368565, at *11 (D. Conn. Sept. 19, 2011) ("Mikelic only stated that he wanted to speak with his lawyer with respect to certain questions . . . . Thus, it did not violate the Fifth Amendment for [law enforcement] to continue questioning Mikelic following Mikelic's limited invocation of his right to counsel."); People v. Adams, 627 N.W.2d 623, 628 (Mich. Ct. App. 2001) ("Because defendant only declined to answer some questions regarding a few limited topics and only asserted a need for counsel with respect to questions regarding motive . . . the police detective was permitted to continue interviewing defendant regarding other matters pertaining to the . . . murder."); State v. Brennan, 850 P.2d 202, 206 (Idaho Ct. App. 1993) (affirming the trial court's denial of a suppression motion when the defendant refused to discuss "the events of the night of June 19" with the police but agreed to discuss "related background events"); see generally 2 Wayne R. LaFave et al., Crim. Proc. § 6.9(g) (4th ed., Dec. 2020 update) ("It is possible that the defendant's invocation of his

counsel "a broad, rather than a narrow, interpretation." Barrett, 479 U.S. at 529.

right to counsel will be limited in some way, in which case application of the *Edwards* rule is limited to the same extent, as the Supreme Court concluded in *Connecticut v. Barrett*."). Rought's brief acknowledges that invocations can be limited in scope, as Rought's counsel conceded at oral argument.[4]

There is scant authority, however, addressing the interaction between the <u>Barrett</u> and <u>Bradshaw</u> decisions — that

---

[4] The dissent contends that <u>Barrett</u> does not justify "holding that police may continue questioning a suspect after he has invoked his right to counsel on a topic that is germane to their investigation." Dissenting Op. 9. This contention is refuted by the <u>Barrett</u> decision itself: after the suspect there invoked his right to counsel as to written statements, law enforcement continued to question him about the very same investigation and secured an oral confession, which the Court held admissible. 479 U.S. at 525, 529.

The dissent counters that "<u>Barrett</u>'s invocation as to written statements is not analogous to a topic-specific invocation" because "<u>Barrett</u>'s invocation did not suggest that he felt unable to handle the pressures of interrogation on any topic." Dissenting Op. 9–10. This account of <u>Barrett</u> is implausible. The Court's opinion offers no basis for distinguishing between limited invocations that suggest an inability to "handle the pressures of interrogation on any topic" and those that do not. To the contrary, the Court distinguished between invocations that are "limited" and those that are "effective for all purposes," with the scope of the former to be discerned by the "tenor or sense of a defendant's response" to the <u>Miranda</u> warnings, and not some gestalt impression of a suspect's fortitude under questioning, as the dissent would have it. 479 U.S. at 528-30.

15

is, between limited invocations and post-invocation initiations. It is clear that if law enforcement unilaterally seeks to obtain statements from a suspect about matters within the scope of a limited invocation, those statements would be inadmissible. See Barrett, 479 U.S. at 529. But when can law enforcement resume interrogation on a topic covered by a limited invocation? And what qualifies as an "initiation" on a covered topic following a limited invocation?

As an initial matter, it cannot be the case, as Rought asserts, that a complete cessation of all interrogation is required before law enforcement can resume interrogation on a covered topic. That would be inconsistent with the Barrett decision, which counsels that interrogation can continue as to matters outside the scope of a limited invocation. Instead, it is sufficient if law enforcement respects the suspect's wishes and ceases interrogation concerning any topic covered by a limited invocation. This means no more questions not only about the covered topic, but also about any topics "that the police should know are reasonably likely to elicit an incriminating response from the suspect" about the covered topic. Innis, 446 U.S. at 301 (footnote omitted).

Assuming that law enforcement has ceased interrogation about the covered topic, we agree with the Government that as a practical matter, a suspect's post-invocation "initiation" must mean something like bringing "the subject back up." Gov't Br. 26; see also Oba, 978 F.2d at 1130 (concluding there was no Edwards violation where suspect "initiated further discussion" concerning the topic covered by his limited invocation). Following Bradshaw and Velasquez, we hold that after a limited invocation, "an initiation occurs when a suspect initiates a [line of discussion that] evinc[es] a

16

willingness and a desire for a generalized discussion about the [covered topic]." Velasquez, 885 F.2d at 1085. And we agree with the District Court that it is important for the suspect to bring the covered topic back up without undue prompting from law enforcement. See App. 97 ("[L]aw enforcement did not prompt Rought's return to the subject of Mr. Carichner"). As noted above, then, there is no "initiation" on a covered topic if the suspect is responding to "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect" concerning the covered topic. Innis, 446 U.S. at 301 (footnoted omitted); cf. Edwards, 451 U.S. at 484 ("[A] valid waiver of th[e] right [to counsel] cannot be established by showing only that [a suspect] responded to further police-initiated custodial interrogation even if he has been advised of his rights.").[5] That is, there is no "initiation" by the suspect if the suspect is responding to interrogation that law enforcement should know is reasonably likely to elicit a response on the covered topic.[6]

In sum, if a suspect makes a limited invocation of the

---

[5] There may be other circumstances in which law enforcement unduly prompts a suspect to initiate a post-invocation discussion of a topic covered by a limited invocation short of interrogation, but they are not before us, and we need not consider them. Likewise, we need not consider whether law enforcement must re-inform a suspect of his Miranda rights before resuming interrogation on a covered topic following an initiation — though doing so would likely minimize doubt that a suspect's waiver is voluntary, knowing, and intelligent.

[6] The dissent's suggestion that today's decision creates a "gotcha game" because interrogators "can try to induce [a

17

right to counsel, the Edwards rule is limited to the same extent. See 2 LaFave, supra, Crim. Proc. § 6.9(g). Law enforcement must honor the suspect's request and cease interrogation concerning any topics covered by the invocation. If the suspect then initiates discussion of covered topics without prompting from law enforcement, interrogation can resume as to those topics. If the suspect validly waives the right to silence and the previously invoked right to counsel, then the suspect's statements on the covered topic may be admissible at trial.

B.

We now evaluate Rought's arguments in light of these legal principles.

1.

Rought first argues that his invocation of the right to counsel was not limited to the circumstances of Carichner's death but was "for all purposes," and that law enforcement was therefore required to cease interrogation entirely under Edwards. We disagree.

Whitehead properly informed Rought of his Miranda rights at the outset of the interrogation. Rought said he was willing to talk "to a point." Rought proceeded to discuss a variety of topics, including his addiction, his fentanyl source,

---

suspect] to talk about the very topic that he has said he does not want to discuss," *see* Dissenting Op. 1, is thus misplaced. If interrogators do so, the suspect will not have re-initiated and the Edwards rule will still be in effect as to any topics covered by the invocation.

18

his relationship with Carichner, and his criminal history. It was only when Whitehead said, "So let's talk about Dana. What happened there?" that Rought responded, "I don't really want to talk about that aspect without my lawyer. . . . That's a serious situation. I mean, they're trying to roof me."

In context, it is plain that "that aspect" refers to the circumstances of Carichner's death. Rought had previous experience with the criminal justice system, understood his Miranda rights, and openly spoke about other facets of his own criminal conduct. He had just been indicted for possession with intent to distribute resulting in serious bodily injury and death — a charge likely to result in a long prison sentence. Given this context and the course of the interrogation up to the point of Rought's invocation, "that aspect" is most naturally understood to refer to Carichner's death — a "serious situation" that could result in Rought getting "roofed," and distinct from the subjects Rought had been discussing up to that point.

Rought argues that his invocation was not so limited, and that "'that aspect' could mean only one thing: any matter relating to the circumstances of Carichner's death, including Rought's involvement in drug dealing in general." Rought Br. 22. Alternatively, he argues that his invocation was ambiguous and should be construed broadly. Again, we disagree, and the District Court's determinations to the contrary were not clearly erroneous. It is not plausible that by refusing to discuss "that aspect" of the case without a lawyer, Rought was actually expressing "his desire to deal with the police *only* through counsel." Edwards, 451 U.S. at 484 (emphasis added). To accept Rought's argument would require "a disregard of the ordinary meaning of [his] statement." Barrett, 479 U.S. at 530.

19

In context, the limited nature of Rought's invocation is not ambiguous. Cf. In re Friedman's Inc., 738 F.3d 547, 554 (3d Cir. 2013) (noting that ambiguity must be evaluated in light of overall context).

Rought further argues that it would "belie[] common sense" to find that he "was sufficiently astute and calm" to make only a limited invocation, and that it is "perverse" to penalize a suspect who "happens to be too garrulous for his own good" because his lawyer has not yet arrived. Rought Br. 22-23. These arguments are beside the point. The Supreme Court has made clear that Miranda protects a suspect's choice to speak or not, and that if the warnings are understood, it is of no moment "that some might find [Rought's] decision illogical." Barrett, 479 U.S. at 529-30.

We therefore conclude that there was no clear error in the District Court's determination that Rought's "invocation of the right to counsel was limited and not broad in nature," and that he "left all other subjects open to questioning." App. 97.

2.

Rought next argues that he did not initiate the post-invocation discussion of Carichner's death. He asserts initially that there cannot be a post-invocation initiation if "the interrogation never ceases." Rought Br. 23. We reject this argument for reasons already given — the teaching of Barrett is that interrogation need not cease entirely following a limited invocation, but can continue as to matters not covered by the invocation.

After Rought's invocation, Whitehead responded that

he respected Rought's right, and refocused the interrogation on Rought's drug supplier, L.B. In an effort to persuade Rought to cooperate in pursuing L.B., Whitehead emphasized the harm that drug addiction and drug dealers visit on the community, and mentioned the overdose of Rought's friend Stan Derby, another addict who bought from L.B. Whitehead asked for information that would help in "going up the ladder" after L.B. and others like him. Whitehead's comments prompted Rought to state that drug dealers are "killing my friends just as much as, right now, you're trying to say that I killed" Carichner. We hold that when Rought made this statement, he initiated discussion on Carichner's death and thereby opened himself up to further interrogation on that subject. His voluntary return to the subject of his then-alleged role in Carichner's death evinced a willingness for a generalized discussion about the issue. See Bradshaw, 462 U.S. at 1045-46 (plurality opinion) (concluding that respondent initiated post-invocation by asking, "Well, what is going to happen to me now?"); Velasquez, 885 F.2d at 1085 (holding that defendant initiated post-invocation by asking, "What is going to happen?").

Rought argues that Whitehead's comments following Rought's invocation about Derby's overdose and going after L.B. were intended "to elicit Rought's verbal response" about Carichner, in order "to create a record that might support a finding of post-invocation initiating." Rought Br. 24. As a general matter, we acknowledge that it is not totally unforeseeable that an appeal to Rought's conscience and a reference to Derby's overdose could lead Rought to discuss Carichner's overdose.

But on this record, we agree with the District Court that "[t]he question[s] about L.B. and Mr. Derby [concerned]

21

subjects distinct from . . . the circumstances surrounding Mr. Carichner and [were] not ones that law enforcement should have reasonably anticipated would prompt Rought to renew discussions about Mr. Carichner." App. 97. Much of the interrogation up to that point was focused on gathering information about L.B. and discussing the deleterious effects of drug addiction and drug dealing. Rought had been willing to discuss those issues, but then carved out Carichner's death as a forbidden topic. An agent in Whitehead's position could reasonably have expected that Rought would continue to differentiate among the distinct issues in the interrogation, notwithstanding some overlap in subject matter.[7] Likewise, an agent in Whitehead's position could reasonably have expected that his request for Rought's help in going after L.B. would not prompt Rought to bring Carichner back up shortly after Rought indicated that he did not want to discuss Carichner. We do not think it justifiable, given this context, to charge Whitehead with the knowledge that his comments may have elicited a response from Rought about Carichner's death. See Innis, 446 U.S. at 301 (holding that interrogation includes "words or actions on the part of the police . . . that the police should know

_____

[7] The dissent's argument that Carichner's death, Derby's death, and the effects of drugs on the community were all part of one big topic of conversation is belied by the record. Rought and his interrogators differentiated between these subjects, the District Court accordingly found that they were "distinct," and that finding was not clearly erroneous. App. 97.

are reasonably likely to elicit an incriminating response").[8]

3.

Lastly, Rought argues that any post-invocation waiver was not effective because he was not "fully aware of the consequences if he were to waive his right to counsel to any extent." Rought Br. 26. Rought argues in particular that he "could not have been fully aware of the consequences concerning involvement in a conspiracy, and how broadly such charges would sweep." Id. But he otherwise concedes that, given "the totality of the circumstances, it might be reasonable to infer that [he] was fully aware of the consequences of waiving [the] right to counsel concerning legal issues arising out of any involvement" in Carichner and Giberson's overdoses. Id.

Rought's argument that his waiver was invalid because he did not foresee all of its potential consequences is meritless. It is beyond cavil that "[t]he Constitution does not require that

_____

[8] Rought also takes issue with Whitehead's comments that Rought "had a role" in Carichner's death and that Rought must "feel like shit" about it. By the time Whitehead made these comments, however, Rought had already initiated discussion about Carichner's death, and was thus subject to interrogation about that topic. Velasquez, 885 F.2d at 1087. Accordingly, we do not reach the question whether these comments by Whitehead amounted to interrogation under Innis, as the answer does not affect our disposition of Rought's appeal. The dissent's suggestion that these statements have any bearing on whether Rought re-initiated discussion about Carichner's death is mistaken for the same reason.

23

a criminal suspect know and understand every possible consequence of a waiver." Spring, 479 U.S. at 574. A waiver is generally held to be knowing and voluntary "if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it." United States v. Ruiz, 536 U.S. 622, 629 (2002). We long ago observed that "[i]t is not in the sense of shrewdness that *Miranda* speaks of 'intelligent' waiver but rather in the tenor that the individual must know of his available options before deciding what he thinks best suits his particular situation." Collins v. Brierly, 492 F.2d 735, 739 (3d Cir. 1974) (en banc). A similar principle applies to the voluntariness inquiry. See Barrett, 479 U.S. at 530 ("The fact that some might find Barrett's decision illogical is irrelevant, for we have never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.'" (footnoted omitted) (quoting Oregon v. Elstad, 470 U.S. 298, 316 (1985))).

Rought makes only the above argument concerning waiver; he has thus forfeited all others. See Barna v. Bd. of Sch. Dirs., 877 F.3d 136, 145 (3d Cir. 2017). Even if Rought had preserved additional arguments and not conceded the point, we would readily conclude that his post-invocation waiver was voluntary, knowing, and intelligent under the totality of the circumstances. Rought was read his Miranda rights, signed a form acknowledging that he understood them, and consented to questioning. He had prior experience with the criminal justice system and was surely aware that his statements to law enforcement could be used against him. There is also no basis in the record for finding involuntariness. Neither Whitehead's comment about Rought's role in

24

Carichner's death nor anything else he or Yelland said or did approaches the kind of law enforcement overreach necessary to render a statement involuntary. See Colorado v. Connelly, 479 U.S. 157, 163-65 (1986); Velasquez, 885 F.2d at 1087-89; Miller v. Fenton, 796 F.2d 598, 603-13 (3d Cir. 1986); 2 LaFave, supra, Crim. Proc. § 6.2(c) nn.120-61 and accompanying text. By choosing to speak in detail about the circumstances of Carichner's death after initiating discussion on that topic, Rought knowingly, intelligently, and voluntarily waived his right to remain silent and his limited invocation of the right to counsel. See Berghuis, 560 U.S. at 384; Velasquez, 885 F.2d at 1087-89.

\* \* \* \* \*

Rought made a limited invocation of his right to counsel, cutting off questioning only about the death of Dana Carichner. Shortly after that invocation, he initiated conversation with law enforcement about Carichner's death, and waived his previously invoked right not to discuss Carichner without counsel's assistance. Rought's post-invocation statements were thus admissible against him at trial, and the District Court correctly denied his motion to suppress. IV.

For the foregoing reasons, we will affirm the judgment of the District Court.

*United States of America v. James Rought*

No. 20-2667

_____

ROTH, <u>Circuit Judge</u>, dissenting.

The right to counsel during an in-custody interrogation should not be the target of a "gotcha game."[1] The interrogator shouldn't consider a suspect's invocation of the right to counsel as an opportunity to trick the suspect into bringing up, on his own, the protected subject matter. If the suspect does so, "gotcha!" He has waived the right to counsel.

The Majority has created the perfect playing field for a gotcha game. In permitting a "limited," topic-specific invocation of the right to counsel, the Majority leaves the suspect in a morass of what topics are protected by the request for counsel and what topics the interrogators can continue to pursue. The interrogators not only can continue questioning him about other topics, but they also can try to induce him to talk about the very topic that he has said he does not want to discuss. If the suspect is induced to say something about the protected topic, he has waived the right to counsel. Gotcha! For these reasons, I do not agree with the Majority's decision.

**I.**

_____

[1] "Gotcha" is defined as "to exultingly point out a blunder, etc". Random House Webster's College Dictionary, (2d ed. 1999).

1

*Miranda*[2] is based on the Court's determination that "in-custody interrogation . . . contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."[3]  "Even without employing brutality, the 'third degree' or . . . specific stratagems . . . the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals."[4]  Thus, "custodial interrogation [must] be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney."[5]  If the suspect invokes his right to counsel, it creates a presumption "that he considers himself unable to deal with the pressures of custodial interrogation without legal assistance."[6]  Police "must cease the interrogation if at any point the suspect indicates that he wishes to remain silent or that he wants an attorney."[7]

## A.

The Majority seems oblivious to the coercive character of custodial interrogation that motivated the Supreme Court in *Miranda*[8] to protect the constitutional right against self-incrimination.  This inherently coercive pressure of custodial

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] *Id.*at 467

[4] *Id.* at 455.

[5] *Edwards v. Arizona*, 451 U.S. 477, 481–82 (1981).

[6] *Arizona v. Roberson*, 486 U.S. 675, 683 (1988).

[7] *United States v. Velasquez*, 885 F.2d 1076, 1084 (3d Cir. 1989) (citation omitted).

[8] 384 U.S. 436.

2

interrogation may affect the suspect in several significant ways.

Of prime importance is the fact that a suspect's decision to talk about some topics, but not others, may be compromised by the ongoing interrogation. When a suspect invokes his right to counsel, he has indicated "that he considers himself unable to deal with the pressures of custodial interrogation without legal assistance."[9] If a suspect explicitly states that interrogation on some topics is too much for him, can we assume that he can handle interrogation on *similar* topics? In particular, if the suspect has come to this conclusion while the coercive interrogation is *still ongoing*, how reliable is his decision? As Rought argues, it "belies common sense" to conclude that a suspect "[i]s sufficiently astute and calm" during an FBI interrogation "to carve out a subset of . . . discussion topics"[10] that he is able to handle.[11]

Moreover, even if a suspect can "carve out a subset of discussion topics," the Majority ignores the difficult legal landscape that the suspect now must navigate to avoid being caught in a "gotcha game":

_____

[9] *Roberson*, 486 U.S. at 683.

[10] Opening Br. 23.

[11] Indeed, even the suspect's statements on other topics not covered by the invocation are likely tainted by the coercive nature of the custodial interrogation.: "[T]he presumption . . . that [the suspect] considers himself unable to deal with the pressures of custodial interrogation without legal assistance . . . does not disappear simply because the police have approached the suspect, still in custody, still without counsel, about a separate investigation." *Roberson*, 486 U.S. at 683.

3

- While in this coercive setting, the suspect must make sure that his invocation of the right to counsel is "unequivocal," not just unequivocal from his own perspective or even from a reasonable layperson's perspective, but from the perspective of a reasonable *police officer*.[12] A request for an attorney, which is ambiguous or equivocal, as understood by a reasonable interrogator, does not invoke the right to counsel.[13]
- Moreover, under the Majority's holding, the suspect must now make sure that an unequivocal invocation is not construed (also from the perspective of an interrogator[14]) as being "limited" in some way. If the suspect intended the invocation to be unlimited and the interrogators misconstrue it as limited and continue to ask him questions, what is the suspect to make of their earlier promise to cease interrogation if he invoked his rights? Does he clarify that his invocation was not limited by invoking his rights *again* or does he simply conclude that the interrogators have no intention of

---

[12] *Davis v. United States*, 512 U.S. 452, 459 (1994); *accord Flamer v. Delaware*, 68 F.3d 710, 725 (3d Cir. 1995).

[13] *Id.*

[14] *Compare Burrell v. Commonwealth*, 710 S.E.2d 509, 516 (Va. Ct. App. 2011) ("[T]he qualification must be one that a reasonable police officer would understand as placing a specific question outside the boundaries of the interrogation[.]"), *with People v. Firestine*, 132 N.E.3d 886, 894–95 (Ill. App. Ct. 2019) ("We find that the better approach is to hold that, if a qualification or limit is ambiguous, the qualification or limit itself is ineffective.").

4

respecting his rights and that re-invoking them would be "futile"?[15]

- If the suspect did intend his invocation to be limited, he must determine what scope a reasonable interrogator will give to the limitation.[16] If the police ask about topics that the suspect believed were covered by his invocation, will he realize that the police merely *misconstrued* his invocation—rather than ignored it— and clarify the invocation for them? If the suspect is frightened or timid or has poor command of English, will he be able to do so? Perhaps he will just conclude that clarification would be futile.

- Even if the interrogators properly construe his limitation, the suspect must make sure that he does not inadvertently say something that will later be construed by a court as his reinitiating on his own the discussion of topics that he has said he is unable to handle without counsel.

- Finally, the suspect must do all this while continuing to respond to interrogation on other topics.

The number of landmines a suspect must avoid is mind-boggling. I cannot accept a rule that treats a suspect like a law

---

[15] *Davis*, 512 U.S. at 472–73 (Souter, J., concurring).

[16] This situation is a prime example of how exceedingly difficult it is to draw a line between what is and what is not "covered" by a topic-specific invocation. Looking at the case before us, did Rought's invocation of counsel mean that he did not want to talk about Carichner's death without counsel present or that he did not want to talk about his drug dealings with Carichner, or both. The government claims the former, but that is not clear from the record.

school student who is taking an exam on criminal procedure. For suspects, the interrogation is not a hypothetical fact pattern; it is something they must navigate in real time while under extreme pressure—held alone and against their will, beset by police interrogators, and fearful of conviction and imprisonment. In the real world, the Majority's labyrinthine approach opens the door for the police to play "gotcha" by enabling them to (1) grind down a suspect's will and "badger[] [him] into waiving his previously asserted *Miranda* rights,"[17] or (2) subtly subvert the limits imposed by his topic-specific invocation.

The Majority's approach will favor savvy suspects who understand the rules of the game but it will leave unsavvy suspects to fend for themselves. That is precisely the result that *Miranda* forbids: Under *Miranda*, the interrogators must state the rules, clearly and unequivocally, at the beginning of the interrogation for the benefit of savvy and unsavvy suspects alike.

## A.

At one time, the Supreme Court jealously guarded *Miranda*'s prophylactic rule. In *Edwards*,[18] the Court held that once a suspect invokes his right to counsel, he cannot later waive that invocation without counsel present[19] unless the suspect, not the police, "initiate[s] further discussions" about

---

[17] *Id.* at 485 (O'Connor, J.) (quotation marks and citation omitted).
[18] 451 U.S. 477 (1981).
[19] *See Roberson*, 486 U.S. at 681.

the investigation.[20]   Otherwise, police could "badger[] the defendant into waiving his previously asserted *Miranda* rights."[21]  The Court has also held that "[t]he *Edwards* rule . . . is not offense specific:  Once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present."[22]  "[T]he presumption raised by a suspect's request for counsel—that he considers himself unable to deal with the pressures of custodial interrogation without legal assistance— does not disappear simply because the police have approached the suspect, still in custody, still without counsel, about a separate investigation."[23]

Over time, however, the Court has taken some steps to pare *Miranda* back.  For example, in *Davis v. United States*, the Court held that *Edwards* does not apply where "the suspect's statement is not an unambiguous or unequivocal request for counsel."[24]   That holding drew forceful disagreement from four Justices, who stated that it lacked "coherence with nearly three decades of case law addressing the relationship between police and criminal suspects in custodial interrogation."[25]  Obviously, we are bound by *Davis*. But unlike the Majority, I would not erode *Miranda* further. Our precedents do not support the Majority's narrow

---

[20] *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (citation omitted).
[21] *Davis*, 512 U.S. at 458 (quotation marks and citation omitted).
[22] *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991) (citing *Roberson*, 486 U.S. at 682).
[23] *Roberson*, 486 U.S. at 683.
[24] *Davis*, 512 U.S. at 461–62.
[25] *Id.* at 467–68.

7

construction of topic-specific invocations of the right to counsel. Rather, *Edwards* and its progeny convince me that, once a suspect invokes the right to counsel as to one aspect of the police's investigation, the police may not continue to question him, while still in custody and still without counsel, about *any* aspect of their investigation.

## B.

The Supreme Court has never held that topic-specific invocations of the Fifth Amendment right to counsel are "limited" to the identified topics.[26] Before today, neither had we. Only one other circuit has done so in a published in opinion,[27] relying (like the Majority) on *Connecticut v. Barrett*.[28] A handful of district and state courts have done the same.

None of these courts has explained, however, why *Barrett* supports holding that police may continue questioning a suspect after he has invoked his right to counsel on a topic that is germane to their investigation. Simply put, it does not. *Barrett* did not involve a topic-specific invocation. Rather, Barrett told police "that he would not give a written statement unless his attorney was present but had 'no problem' talking about the incident."[29] The Supreme Court held that Barrett's subsequent oral statements were admissible.[30]

---

[26] *But see Roberson*, 486 U.S. at 684 (alluding to the possibility of topic-specific invocations in a counterfactual).

[27] *United States v. Ivy*, 929 F.2d 147, 152–53 (5th Cir. 1991).

[28] 479 U.S. 523 (1987).

[29] *Barrett*, 479 U.S. at 525.

[30] *Id.* at 529.

8

Even if Barrett had not affirmatively stated his willingness to undergo unlimited oral interrogation,[31] however, Barrett's invocation as to written statements is not analogous to a topic-specific invocation. Notwithstanding the *Barrett* Court's *dictum* that Barrett's invocation would have been effective to exclude written statements, *Miranda* provided for the right to the presence of counsel for a specific purpose—*i.e.*, custodial interrogation.[32] Barrett's invocation did not suggest that he felt unable to handle the pressures of interrogation on any topic. The act of writing down a statement does not involve interrogation to any extent that providing an oral statement does not already involve. It thus is not surprising that asking for counsel as to only written statements is not sufficient to force police to stop oral questioning altogether.[33] By contrast, a topic-specific invocation relates

---

[31] *See United States v. Martin*, 664 F.3d 684, 689 (7th Cir. 2011) (holding that lack of explicit consent to further questioning was not dispositive).

[32] *See McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (explaining that *Edwards* applies only where the suspect asks "for the particular sort of lawyerly assistance that is the subject of *Miranda*"—"the assistance of an attorney *in dealing with custodial interrogation by the police*").

[33] Some courts have similarly held that a suspect's refusal to sign a form or take a polygraph without counsel is a "limited" invocation. *See, e.g., United States v. Oba*, 978 F.2d 1123, 1130 (9th Cir. 1992); *Stumes v. Solem*, 752 F.2d 317, 320–21 (8th Cir. 1985). Like Barrett's refusal to make a written statement, however, those refusals do not express an inability to handle the specific type of pressures identified in *Miranda*. To be clear, I do not suggest that these invocations (or Barrett's invocation) are completely unenforceable under *Miranda*.

9

directly to the suspect's ability to deal with the pressures of custodial interrogation without legal assistance.

Here, Rought indicated that he was unable to deal with those pressures as to at least some topics. If a suspect unequivocally states that he cannot handle an interrogation topic without counsel, *all* interrogation should stop immediately. We should not "adopt a regime in which *Edwards*' protection . . . could pass in and out of existence"[34] depending on the topic being discussed. "Vagaries of this sort spread confusion through the justice system and lead to a consequent loss of respect for the underlying constitutional principle."[35]

Because Rought invoked his right to counsel as to at least one topic of interrogation, Agent Whitehead should have stopped *all* interrogation, including questions regarding drug activity in Wilkes-Barre. Yet, Agent Whitehead immediately continued questioning Rought.

I would reverse the District Court's Order denying Rought's Motion to Suppress and hold that all of Rought's statements after his invocation are inadmissible.

---

Rather, I conclude that they are inapposite and likely do not require police to stop *all* questioning because, unlike Rought's invocation, they do not suggest that the suspect was unable to deal with custodial interrogation specifically.

[34] *Minnick v. Mississippi*, 498 U.S. 146, 154 (1990).
[35] *Id.* at 155.

10

## II.

### A.

Even assuming, however, that police can continue questioning about other topics not mentioned in a request for counsel, I tentatively agree that the District Court did not clearly err in holding that Rought's invocation was limited to "the subject of Mr. Carichner,"[36] but only insofar as "the subject of Mr. Carichner" includes anything about Carichner *and* any drug sharing between Rought and Carichner. To the extent that the District Court construed Rought's invocation as limited only to Carichner's *death*, it clearly erred. Agent Whitehead asked, "Let's talk about Dana? What happened there?" Rought responded, "I don't really want to talk about that aspect without my lawyer because, like, that's a serious situation. I mean, they're trying to roof me . . . ." No reasonable construction of that statement would allow the District Court to find that it was limited to Carichner's death. Whitehead said, "Let's talk about Dana," not "Let's talk about Dana's death"; he asked, "What happened there," not "What happened to Carichner." These statements are not susceptible

---

[36] Appx. 97. I note, however, that even this broader construction survives only because of our generous standard of review. The more reasonable construction of Rought's invocation is that it covered everything for which the government is "trying to roof" him (*i.e.*, send him to prison). Thus, if we were reviewing the invocation *de novo*, I would hold that a reasonable police officer would construe it as covering every topic that could reasonably have led to incriminating statements supporting the charge in the original Indictment.

11

to such a narrow reading.

The Majority holds that "that aspect" was limited to "the circumstances of Carichner's death" in part because Rought had already "openly spoke[n] about other facets of his own criminal conduct." But a suspect can invoke his rights even as to topics about which he has previously spoken. Moreover, the charges on which the government was trying to "roof" Rought (send him to prison) required proof of drug distribution, not merely that Rought caused Carichner's death.

**B.**

The Majority holds that Rought reinitiated discussion about Carichner when he said, "you're trying to say that I killed my friend." Not so. Before Rought said anything, Whitehead continued the interrogation by asking about Derby and drug dealing's effects on the "community."

The District Court believed that "[t]he questioning about L.B. and Mr. Derby, a person to whom L.B. sold drugs, were subjects distinct from that of the circumstances surrounding Mr. Carichner."[37] Again, I disagree. Rought allegedly provided Carichner with drugs obtained from L.B., causing his death. Derby similarly died because of L.B.'s drugs. Inevitably, focusing on Derby's death and the effects on the "community" would lead back to Carichner's similar death and its similar effects on the community. Indeed, earlier in the interrogation, Whitehead said that "a tragedy resulted from your actions. And *not just yours* . . . . This is what's going on daily *in the community*."

---

[37] Appx. 97.

12

Nor did Whitehead try to turn the conversation back to L.B. He said that he wanted to talk about L.B. *because* he was "trying to make sense of it," *i.e.*, make sense of the overdoses. Only then, when questioned about L.B. *in that context*, did Rought say, "you're trying to say that I killed my friend."

Rought's statement did not change the subject of the conversation. At most, Rought made a passing reference to the charges against him while talking about how *other drug dealers* were "killing [his] friends"—the same topic Whitehead had already brought up in his questions about Derby, the "community," and "wanting to understand" the overdoses. This passing reference does not show a "desire for a generalized discussion" about topics Rought explicitly said he would not discuss without counsel—at least not any more than Whitehead's questioning had already brought up those topics. Yet, Whitehead took this as an invitation: "[W]e're not saying you killed him, James, but what we're saying is that, um, you had a role. . . . and I'm sure you feel like shit. . . . [N]one of us are going to say that you went there with intent and malice."

Whitehead's questions and statements were directed at Rought. His question about Derby was made in connection with his statements about being "caught in a bad spot," "help[ing] the community," and a slew of others. They were provocative: "I'm sure you feel like shit." And at this point, Whitehead could clearly see that Rought was distraught over the loss of his friends. Goading a defendant with comments about the loss of his friends and hurling accusations at him in an FBI interrogation room is custodial interrogation.[38]

---

[38] *Cf. United States v. Lafferty*, 503 F.3d 293, 302 (3d Cir. 2007) (holding that police did not "scrupulously honor"

13

Accordingly, the interrogation was reinitiated by Whitehead, not Rought.

## III.

In conclusion, this case is a prime example of why topic-specific invocations should not be "limited." Interrogations are too messy, and the pressures they exert too subtle and susceptible to police exploitation. Because I disagree with the Majority's new rule and its application of that rule to the facts of this case, I respectfully dissent. I would suppress all of Rought's statements after his invocation of the right to counsel. In the alternative, if we were to allow limited invocation of the right to counsel, I would hold that Rought did not waive his request for counsel and similarly that Rought's statements after the invocation of the right to counsel should be suppressed.

---

invocation of right to remain silent by placing defendant in interrogation room with codefendant while they interrogated the codefendant).